**Received Electronically**
**February 24, 2026**
**United States Court of Appeals**
**For the First Circuit**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

|  |  |  |
|---|---|---|
| Hooksett Sewer Commission, Wastewater Treatment Facility | ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Docket:_____ |
| United States Environmental Protection Agency, | ) ) ) ) | |
| Respondent. | ) ) ) | |

## PETITION FOR REVIEW

Pursuant to the grants of original jurisdiction under § 509(b)(1)(E-F) of the Clean Water Act ("CWA" or "the Act"), 33 U.S.C. §§ 1369(b)(1)(E-F), the Hooksett Sewer Commission ("HSC" or "Petitioner"), hereby petitions this Court for review of Respondent's, United States Environmental Protection Agency ("EPA" or "the Agency" or "Region 1"), NPDES General Permit for New Hampshire Medium Wastewater Treatment Facilities (NPDES Permit No. NHG590000).

1

**INTRODUCTION**

HSC petitions this Court for review of the Medium Wastewater Treatment Facility General Permit, NPDES Permit No. NHG590000, issued on November 3, 2025 (the "Permit"). The Permit imposes substantial new compliance burdens and expanded agency oversight on HSC's publicly operated wastewater treatment facility serving the Town of Hooksett, New Hampshire—requirements that are unsupported in the administrative record, inadequately explained, and arbitrary and capricious.[1]

On November 13, 2024, EPA issued a draft permit and noticed public comment to remain open for ninety-days. HSC and its representatives submitted extensive comments on the draft permit. Although HSC provided detailed technical and cost information demonstrating why several proposed requirements in the draft permit were unwarranted and unduly burdensome for a medium-sized community system, EPA left those requirements in place when it issued the Permit. EPA's responses to comments in the Permit are conclusory and, in key respects, fail to engage with the substance of HSC's comments, leaving HSC without a clear articulation of the agency's rationale or the record basis for the challenged provisions.

HSC seeks this Courts review to modify EPA's lack of reasoned decision-making and failure to justify material permit conditions. Specifically, HSC challenges the following aspects of the Permit and EPA's response to comments:

1. <u>Industrial pretreatment testing requirements on HSC where no Industrial Pretreatment Program obligation exists</u>. The Permit's requirement in Part II.E.4 mandates testing associated with an Industrial Pretreatment Program ("IPP") even

---

[1] The Town of Hooksett is in Merrimack County, New Hampshire, with a population of 15,377 according to latest census data.

though HSC does not operate an IPP, and the record or response to comment by EPA does not explain the legal or technical basis for imposing IPP-related testing requirements on a facility without such a program.

2. <u>PFAS Monitoring is Unjustified.</u> EPA's Response to Comment 6 and inclusion of PFAS monitoring fails to provide a reasoned, record-based justification for the Permit's PFAS monitoring at Part II.A.1 because it is not tied to any applicable surface-water criteria or other legally operative benchmark.

3. <u>EPA does not meaningfully address the comment regarding practical feasibility of the Permit's PFAS and AOF monitoring regime</u>. EPA's decision to impose an expansive PFAS and AOF monitoring obligation on HSC represents an arbitrary and capricious departure from its own stated approach. The Permit requires quarterly PFAS/AOF monitoring that unduly burdens municipalities and strains existing capacity.

4. <u>Mandatory use of PFAS sampling Method 1633A absent promulgation through rulemaking is impermissible</u>. EPA requires HSC to utilize Method 1633A at Part II.E.4 for PFAS sampling even though that method has not been promulgated through rulemaking.

5. <u>Unexplained and unsupported cost assumptions regarding new sampling requirements</u>. The Permit inadequately addresses HSC's comment documenting the substantial costs associated with expanded sampling.

Petitioner respectfully requests that the Court grant the Petition and remand the matter to EPA Region 1 for revisions consistent with the Court's decision.

## STATUTORY AND FACTUAL BACKGROUND

### 1. The Clean Water Act

It is useful to begin with an overview of the legal landscape that is relevant to this Petition. The CWA prohibits the "discharge of any pollutant" unless that discharge complies with National Pollution Discharge Elimination System ("NPDES") permit requirements. 33 U.S.C. §§ 1311(a), 1342. EPA is responsible for issuing NPDES permits unless a state agency is authorized to do so. *Id.* § 1342(a)-(c). No New Hampshire agency is so authorized.[2]

Under the CWA, NPDES permits must include any water-quality-based limitations that are necessary to ensure compliance with the water quality standards of the state where the pollutant discharge in question is to occur, as well as those of any affected downstream states. *See id.* §§ 1311(b)(1)(C), 1341(a)(2); 40 C.F.R. §§ 122.4(d), 122.44(d)(4). Giving effect to this requirement, EPA regulations provide that NPDES permits "must control all pollutants" that the EPA "determines are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard . . ." 40 C.F.R. § 122.44(d)(1)(i); *see also Arkansas v. Oklahoma*, 503 U.S. 91, 110 (1992) (explaining how this framework incorporates state water quality standards into "the federal law of water pollution control").

NPDES permits issue for a period of time not to exceed five years. 33 U.S.C. §§ 1342(a)(3), (b)(1)(B); 40 C.F.R. § 122.46(a). Upon receiving a permit renewal application, the permitting authority—the EPA, in this case—prepares a draft permit

---

[2] New Hampshire does not have delegation authority under 33 U.S.C. §§1342(b) and 1344(g) of the Clean Water Act and therefore Region 1 EPA is responsible for New Hampshire NPDES permitting.

setting out the proposed "effluent limitations, standards, prohibitions . . . and [other] conditions." 40 C.F.R. §§ 124.6(d)(1), (d)(4)(iv). So too must the EPA issue a "fact sheet" that "briefly set[s] forth the principal facts and the significant factual, legal, methodological and policy questions considered in preparing the draft permit." *Id.* § 124.8(a). The public comment period opens when the EPA publishes a public notice of the draft permit. After reviewing the comments submitted during that period, the EPA issues a final permit decision along with a formal "response to comments." *Id.* §§ 124.15(a), 124.17(a).

### A. NPDES General Permits

The Permit at issue here is a general permit, not an individual NPDES permit. EPA's specific regulatory requirements for general permits are currently found at 40 C.F.R. § 122.28. This regulation specifies the scope of sources that are eligible for coverage under a general permit and establishes certain procedures regarding issuance and revocation of coverage under the permit. *See* 40 C.F.R. § 122.28(b) ("General permits may be issued, modified, revoked and reissued, or terminated in accordance with applicable requirements of part 124 of this chapter or corresponding State regulations.").

Under 40 C.F.R. § 122.28(a), the scope of coverage under a general permit is defined both on a geographic basis and through categories of sources covered under the permit. The regulation provides that the area of coverage should generally be based on geographic and political boundaries, and it is common for EPA to establish the scope of a general permit on state-wide or EPA region-wide basis.

The regulation provides authority to include differing categories or subcategories of sources under a single general permit. *Id.* § 122.28(a)(2). Under the regulation, differing

dischargers can be covered under a single general permit, like "treatment works treating domestic sewage," as long as the sources: (1) involve the same or substantially similar types of operations; (2) discharge the same types of wastes or engage in the same types of sludge use or disposal practices; (3) require the same effluent limitations, operating conditions, or standards for sewage sludge use or disposal; (4) require the same or similar monitoring; or (5) in the opinion of the permit writer, are more appropriately controlled under a general permit than under individual permits. *Id.* § 122.28(a)(2)(ii)(A-E). Here, in Region 1, EPA permits medium-sized wastewater treatment facilities under one general permit.

## THRESHOLD PROCEDURAL REQUIREMENTS

HSC satisfies the procedural requirements for seeking the Court's review:

1. HSC has standing because it is a permittee and submitted comments on the Draft Permit. *See id.* § 124.19(a)(2) ("Any person who filed comments on the draft permit . . . may file a petition for review [of a NPDES permit]."); *id.* § 124.19(o)(1)(i-ii) ("Persons affected by an NPDES general permit may not file a petition under this section or otherwise challenge the conditions of a general permit in further Agency proceedings. Instead, they may do either of the following: (i) Challenge the general permit by filing an action in court; or (ii) Apply for an individual NPDES permit . . ."); 33 U.S.C. § 1369(b)(1) ("Review of the Administrator's action . . . (E) in approving or promulgating any effluent limitation or other limitation under section 301, 302, 306, or 405, [33 U.S.C. § 1311, 1312, 1316, or 1345], (F) in issuing or denying any permit under section 402 [302 U.S.C. § 1342] . . . may be had by any interested person in the Circuit Court of Appeals of the United States Federal judicial district in which such person resides or

6

transacts business which is directly affected by such action upon application by such person.").

2. This Petition concerns issues that HSC either (a) raised during the comment period or (b) could not reasonably ascertain during the public comment period because the issues arose only in the Permit or Response to Comments. *See* 40 C.F.R. § 124.13 (petitioners need only raise reasonably ascertainable issues during the public comment process).

3. Region 1 issued the final Permit on November 3, 2025. HSC is timely filing this Petition with the First Circuit within 120 days after Region 1 provided HSC notice of its final permit decision. *See* 33 U.S.C. § 1369(b)(1); 40 C.F.R. § 124.19(o).

## STANDARD OF REVIEW

Judicial review of EPA's action in issuing a General NPDES Permit under the CWA is governed by provisions set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Under the APA, the applicable standard of review is whether the EPA's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Puerto Rico Sun Oil Co. v. U.S. EPA*, 8 F.3d 73, 77 (1st Cir. 1993); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court must determine whether the agency action "bears a rational relationship to the statutory purposes" and whether "there is substantial evidence in the record to support it." *Mercy Hosp. of Laredo v. Heckler*, 777 F.2d 1028, 1031 (5th Cir. 1985).

**ARGUMENT**

**I.  EPA Cannot Impose IPP-Style PFAS Source Sampling on a Non-IPP Facility.**

EPA's Response to Comment 6, and its decision to retain Part II.E.4 in the Permit, is arbitrary and capricious. EPA acknowledges that HSC does not operate an Industrial Pretreatment Program ("IPP"), yet it nevertheless imposes Part II.E.4's categorical PFAS source-identification and annual sampling requirements. Those obligations are designed to be implemented through IPP authorities and enforcement mechanisms that HSC does not have. EPA's response to Comment 6 fails to explain how HSC can reasonably comply with an IPP-style regime, or why imposing it on a non-IPP facility is justified on this record.

A.  EPA's record does not support imposing categorical annual sampling obligations on HSC absent an IPP.

EPA's permit record does not justify treating HSC as though it operates an IPP. Part II.E.4 of the Permit imposes an IPP-style annual sampling obligation on HSC for specified industrial categories. *See* Ex. 1, Permit at 20-21. Yet EPA expressly acknowledges—both in the Permit and in its Response to Comment 6—that HSC does not operate an IPP. *See* Ex. 2, Response to Comments, at 12–14; *see also* Ex. 1. Even so, Part II.E.4 effectively imports a pretreatment-program framework by requiring HSC to identify PFAS sources by industrial category and to conduct annual sampling—requirements typically implemented through pretreatment authorities and enforcement mechanisms that HSC does not have.

Part II.E.4 lists the following categories for annual PFAS sampling:

1. Commercial Car Washes
2. Platers/Metal Finishers

3. Paper and Packaging Manufacturers
4. Tanneries and Leather/Fabric/Carpet Treaters
5. Manufacturers of Parts with Polytetrafluoroethylene (PTFE) or teflon type coatings (i.e. bearings)
6. Landfill Leachate
7. Centralized Waste Treaters
8. Known or Suspected PFAS Contaminated Sites
9. Fire Fighting Training Facilities
10. Airports
11. Any Other Known or Expected Sources of PFAS

*See* Ex. 1, Permit at 21. Despite cost and implementation concerns raised by HSC, EPA nevertheless approved this mandate asserting that annual sampling of these categories is "necessary … to identify the specific sources of PFAS and to inform future decisions regarding source reduction." *See* Ex. 2, Response to Comments at 13. That rationale is conclusory and does not grapple with the threshold problem EPA elsewhere concedes that HSC is not an IPP-designated facility and lacks the pretreatment-program authorities that make categorical industrial-user sampling workable in practice. Requiring HSC to implement an IPP-like sampling regime without the corresponding IPP tools is arbitrary and capricious.

EPA's attempt to dismiss implementation burdens by suggesting HSC can "transfer" costs to industrial dischargers only underscores the problem. *See id.* at 14. The Permit effectively pressures HSC to act as the enforcement intermediary for industrial users—creating administrative friction, disputes over access and compliance, and practical headaches that are inherent to pretreatment administration, not to non-IPP municipal operations. EPA cannot rationally impose a regulatory structure that assumes enforcement leverage the permittee does not possess.

Furthermore, EPA's own PFAS source information further undermines the rationality of imposing these across-the-board categorical sampling obligations. In an EPA

9

document summarizing PFAS contributions by industrial category (Plan 15, Table 5.1), most of the industries listed in Part II.E.4 contribute minimal percentages of overall PFAS loadings. [3] With the exception of platers/metal finishers (reported at approximately 2%), the remaining categorical industrial users in Part II.E.4 of the Permit contribute 1% or less of collective PFAS discharges; in contrast, when looking at the table in footnote 2 categories such as 414 and 423, and drinking-water-treatment-related sources, collectively account for the majority of PFAS discharges (reported at greater than 80%). *Id.*

Lastly, EPA's broad catchall in Part II.E.4—"any other known or expected sources of PFAS"—also sweeps in additional industrial users without any limiting principle, further expanding obligations without record-based justification. *See* Ex. 1, Permit at 21.

B. Part II.E.4 functions as a de facto TRE Requirement, untethered to any trigger and duplicative of the Permit's WET enforcement framework.

The PFAS-source testing regime in Part II.E.4 resembles the investigative steps typically required as part of a Toxicity Reduction Evaluation ("TRE")—a structured process used to identify and correct toxicity sources after a permittee fails or shows persistent noncompliance with Whole Effluent Toxicity ("WET") limits. EPA's own TRE training materials describe this trigger-based approach where WET testing demonstrates that required species survival is not achieved, the permittee undertakes accelerated monitoring and additional investigative steps to determine whether toxicity is persistent and to return the discharge to compliance.[4]

---

[3] Effluent Guidelines Program 15, January 2023 at 5-3, 5-4, 5-5 (https://www.epa.gov/system/files/documents/2023-01/11143_ELG%20Plan%2015_508.pdf).

[4] Module 10, USEPA NPDES Toxicity Reduction Evaluations (TREs) and Toxicity Identification Evaluations (TIEs), at 5 (https://www.epa.gov/system/files/documents/2024-12/module-10-usepa-npdes-tres-and-ties.pdf).

That trigger-based, escalating framework is already addressed in Part II.H.a-b of the Permit, which sets forth accelerated WET testing and follow-on actions when toxicity is detected. *See* Ex. 3, Final Permit, at 31-33. In other words, EPA has already incorporated the mechanism by which investigative and corrective steps should be required—i.e., after a demonstrated toxicity problem—yet Part II.E.4 imposes an analogous investigation-and-testing regime in the absence of any historical WET exceedances or other record evidence justifying a categorical, standing obligation. The result is an unnecessary and redundant regulatory burden, imposed without a reasoned explanation of why the permit's existing WET enforcement framework is insufficient or why a TRE-like set of obligations should apply by default to a facility without an IPP.

For these reasons, EPA's inclusion of Part II.E.4 is arbitrary and capricious and should be remanded and modified.

## II. EPA's PFAS Monitoring Lacks Reasoned Support and is Untethered to Any Applicable Surface-Water Criteria.

An agency must engage in "reasoned decision-making" and act within the bounds of its delegated authority. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). EPA has exceeded its authority under Part II.A.1 of the Permit which impermissibly requires HSC to conduct quarterly PFAS monitoring.

In Response 1, EPA largely assumes—without adequate explanation—that PFAS monitoring is warranted. *See* Ex. 4, Response to Comments at 6-8. While the CWA allows EPA to impose monitoring requirements in appropriate circumstances, monitoring conditions still must be supported by the administrative record and tethered to an intelligible criteria. EPA has not identified applicable PFAS surface-water quality criteria (or other established, legally operative standards) that would supply a clear basis

for determining when PFAS monitoring is necessary, what levels would be of concern, or how the results will be used for compliance decisions. Nor has EPA pointed to record evidence of site-specific adverse impacts to the Merrimack River to motivate monitoring. In the absence of such surface-water criteria, EPA has not articulated a reasoned, record-based justification for the scope and frequency of the required monitoring.

For these reasons, EPA's inclusion of Part II.A.1 is arbitrary and capricious and should be remanded and modified.

**III.     EPA does not Meaningfully Address the Comment Regarding Practical Feasibility of the Permit's PFAS and AOF Monitoring Regime.**

EPA's regulations require Region 1 to "describe and respond to all significant comments on the draft permit . . ." 40 C.F.R. § 124.17(a)(2). EPA's responses "must address the issues raised" by the commenter and "be clear and thorough enough to adequately encompass the issues raised by the commenter." *In re Wash. Aqueduct Water Supply Sys.*, 11 E.A.D. 565, 585 (EAB 2004) (remanding NPDES permit to issuing authority for "failing to respond, adequately or in some cases at all, to significant comments about data representativeness and the reasonable potential analysis in violation of 40 C.F.R § 17(a)(2)").

Rather than responding to the documented concern that laboratories lack sufficient analytical capacity to support the scope and frequency of required monitoring, EPA stated only:

> EPA does not consider that the scope of a nationwide study would somehow limit EPA's ability to collect necessary PFAS and AOF data from each Permittee. As noted in Response 6, EPA finds that this monitoring is necessary.

*See* Ex. 5, Response to Comments at 18-20.  This is a "conclusory statement"—not a reasoned explanation—and it fails to engage the record evidence and real-world capacity constraints identified in the comments.  *In re GSP Merrimack*, 18 E.A.D. 524, 550 (EAB 2021) (quoting *In re Pennzoil Expl. & Prod. Co.*, 3 E.A.D. 389, 392 & n.1 (Adm'r 1990)).

    A.  <u>EPA's own nationwide PFAS study confirms that analytical capacity constraints are real and material.</u>

EPA's own national PFAS wastewater initiative demonstrates that the Agency is well aware of the practical limits on PFAS sampling and laboratory capacity and has structured its data-collection efforts accordingly.  In launching the POTW Influent PFAS Study, EPA, through rulemaking, expressly limited participation to large publicly owned treatment works, generally those with design flows greater than 10 million gallons per day, and later further narrowed eligibility to systems serving populations of 50,000 or more.[5]  Even within that limited universe of large, urban facilities—selected precisely because they have greater technical resources and access to qualified laboratories—EPA acknowledged that staggered sampling would be advantageous, which was likely to not overwhelm available analytical capacity.[6]  As a result, EPA designed the study to rely primarily on one-time grab samples, selected only 200–300 POTWs for actual sampling, capped industrial user sampling at approximately 10 facilities per POTW, and required

---

[5] *See* Proposed Information Collection Request; Comment Request; POTW Influent PFAS Study Data Collection, 89 Fed. Reg. 20,962, 20,962–64 (Mar. 26, 2024); *see also* Agency Information Collection Activities; Submission to the Office of Management and Budget for Review and Approval; Comment Request; Publicly Owned Treatment Works (POTW) Influent Per- and Polyfluoroalkyl Substances (PFAS) Study and National Sewage Sludge Survey (NSSS) (New), 89 Fed. Reg. 82,238, 82,238–39 (Oct. 10, 2024).

[6] U.S. Env't Prot. Agency, POTW Influent PFAS Study, EPA, https://www.epa.gov/eg/potw-influent-pfas-study#study-design (last updated Jan. 15, 2026).

that sampling be staggered and conducted sequentially in order to distribute demand for environmental laboratories completing sample analysis. *Id.*

Against that backdrop, EPA's decision to impose more frequent and more expansive PFAS and AOF sampling obligations on smaller municipal systems—like HSC—through the Permit represents an arbitrary and capricious departure from its own stated approach. The national study EPA relies upon is narrow by design—focused on large POTWs, limited industrial contributors, and largely one-time sampling—yet the Permit at issue here would require *quarterly* PFAS/AOF sampling, including annual sampling tied to industrial users, at medium-sized facilities that were expressly excluded from EPA's national study parameters. *See* Ex. 6, Permit, at 3-6, 10.

Put simply, EPA brushed aside the feasibility concerns raised in Comment 12 with a "conclusory statement" and no meaningful analysis. *In re GSP Merrimack*, 18 E.A.D. 524, 549-50 (EAB 2021) (quoting *In re Pennzoil Expl. & Prod. Co.*, 3 E.A.D. 389, 392 & n.1 (Adm'r 1990)). EPA plainly did not address whether laboratories can meet the required turnaround times, whether there is enough NELAC-accredited capacity in the region, what backlogs can be expected for PFAS/AOF testing, or what the Town is supposed to do if labs cannot perform the analyses on time. Because the record shows EPA failed to grapple with these basic practical constraints, and instead implement costly sampling requirements, the permit should be remanded for further review and modification.

B. <u>The evolving and shifting PFAS landscape further constrains laboratory capacity and increases compliance risk.</u>

The laboratory-capacity problem is compounded by the unsettled status of PFAS analytical methods and the significant burdens laboratories face in bringing new methods

14

online. Laboratories must undertake substantial work to add PFAS methods to their testing repertoire, including method validation, standard operating procedures, internal QA/QC programs, staff training, and accreditation updates. That investment is particularly challenging when methods are evolving (e.g., interim guidance moving from Method 1633 to 1633A discussed below) and laboratories face the risk that, after completing the time-intensive approval and accreditation process, the method will be modified again—requiring repetition of the process.

Although PFAS testing is increasing rapidly across multiple sectors, including drinking water and distribution systems, that demand does not establish that adequate laboratory capacity exists for quarterly PFAS/AOF sampling for every permittee covered by this Permit. To the contrary, increased demand heightens the likelihood of backlogs and limited availability, particularly for medium-sized municipalities with fewer vendor options and constrained budgets.

**IV.     EPA's Monitoring Methods for PFAS/AOF are Impermissible.**

Under the Permit, EPA requires PFAS monitoring to be performed using Method 1633A. *See* Ex. 7, Permit at 10, 21. Similarly, EPA states that AOF monitoring shall proceed under Method 1621. *See* Ex. 8, Permit at 10. Those directives are arbitrary and capricious.

    A. <u>EPA's mandatory monitoring method of PFAS is arbitrary and capricious.</u>

EPA's directive requiring HSC to monitor PFAS analytes using Method 1633A exceeds the bounds of its regulatory authority and does not equate to "reasoned decisionmaking." *Loper Bright*, 603 U.S. at 395. EPA acknowledges in the Fact Sheet that there is no finalized analytical method under 40 C.F.R. Part 136 for measuring PFAS

15

in wastewater or sludge.  *See* Ex. 9, Fact Sheet at 43.  Nevertheless, EPA seeks to impose Method 1633A as a mandatory compliance method.  Method 1633A has not been promulgated through rulemaking.[7]  By requiring compliance with a non-promulgated method, EPA contravenes the procedural mandates of the APA, 5 U.S.C. § 553, and imposes an enforceable obligation without lawful rulemaking.

Further, EPA misstates the legal "finality" of Method 1633—originally issued as an interim method and later revised as Method 1633A—in the record.  In its Response to Comment 11, EPA asserts that "Methods 1633 and 1621 are both final methods . . ." that underwent multi-laboratory validation, review, and comment.  *See* Ex. 10, Response to Comment at 17.  That characterization conflates technical development with lawful promulgation.  However rigorous the validation process may have been, neither Method 1621, 1633 nor 1633A have been formally adopted through notice-and-comment rulemaking or incorporated into 40 C.F.R. Part 136.  Absent promulgation under the APA, 5 U.S.C. § 553, these methods are not "final" in the legal sense required to impose binding NPDES compliance obligations.

EPA cannot elevate an internally recognized method into an enforceable regulatory requirement without completing the required rulemaking process.  To conclude otherwise would sanction agency decision-making that is inconsistent with the limits articulated in *Loper*.

     B. <u>The Permit's method requirements appear internally inconsistent and create uncertainty as to what method applies to which sampling events.</u>

---

[7] U.S. Env't Prot. Agency, Method 1633A: Analysis of Per- and Polyfluoroalkyl Substances (PFAS) in Aqueous, Solid, Biosolids, and Tissue Samples by LC-MS/MS, 3 (Dec. 2024) (EPA 820-R-24-007), available at https://www.epa.gov/system/files/documents/2024-12/method-1633a-december-5-2024-508-compliant.pdf.

HSC's facility discharges to the Merrimack River, which is used as a drinking-water source downstream. PFAS monitoring methods 533 and 537.1 were designed and validated for drinking water.[8] EPA validated these methods for drinking-water analysis, and which together cover 29 PFAS that align with the scope of the National Defense Authorization Act. If EPA is requiring Method 1633A for industrial source sampling, but intends Methods 533/537.1 for ambient river sampling or "pollutant scans," the permit should say so clearly—and justify the distinction. As written, Response 11 and Footnote 14 in the Permit are arbitrary regarding which method governs which monitoring obligations, leaving HSC to guess at compliance expectations and enforcement risk. *See* Ex. 11, Permit at 10, Response to Comment at 17-18; *see also GSP Merrimack LLC*, 18 E.A.D. at 568 (holding permittees should not guess at the Agency's unspoken thoughts in NPDES permitting).

C. <u>EPA's AOF monitoring rationale is insufficient and inconsistent with other EPA general-permit frameworks.</u>

Response 11 also addresses comments about adsorbable organic fluorine ("AOF") monitoring under Method 1621. The core concern is that AOF monitoring is non-specific. In other words, it does not identify whether detected AOF is attributable to PFAS, pesticides, pharmaceuticals, or other sources. EPA acknowledges that concern, yet asserts that it is appropriate to monitor for AOF to fully characterize the pollutant for the next permit reissuance. *See* Ex. 12, Response to Comment at 17-18; *see also In re Dominion Energy Brayton Point, L.L.C.*, 12 E.A.D. 490, 493-94 (EAB 2006) (remanding

---

[8] Federal Register/Vol. 86, No. 245/Monday, December 27, 2021/Rules and Regulations (https://www.govinfo.gov/content/pkg/FR-2021-12-27/pdf/2021-27858.pdf).

NPDES permit for failure to provide more than conclusory reasons for the basis of imposing permit condition).

That justification is arbitrary and capricious because it imposes an affirmative monitoring burden and potential compliance exposure on a municipal treatment facility—particularly where the parameter is non-specific and sources may be diffused and attributable to upstream or third-party contributors beyond the permittee's control.

Moreover, EPA's own general-permit frameworks underscore the lack of a coherent agency rationale. For example, EPA's Pesticide General Permit[9] contains detailed provisions governing water-quality-based effluent limitations and related conditions, but is silent on any analogous programmatic AOF monitoring requirement—even though EPA acknowledges pesticides can materially affect AOF.[10] The Pesticide General Permit does not impose general AOF/PFAS/PFOA monitoring conditions of the type included in this Permit, further highlighting the unexplained and inconsistent approach reflected throughout the Permit.

## V.      EPA Impermissibly Ignored HSC's Cost-Benefit Analysis.

Although the permit writers acknowledged that HSC's new permit will result in "modest" increases in monitoring costs, they provided no justification to their conclusion that HSC "exaggerated" or "significantly overestimate[d]" projected costs to comply with the Permit. *See* Ex. 4, Response to Comments at 6-8. HSC submitted extensive estimates based upon actual quotes for sampling because cost–benefit scrutiny is a core feature of reasoned agency decision-making. *See* Ex. 13; *see also* 33 U.S.C. §

---

[9] 2026 Pesticide General Permit (https://www.epa.gov/system/files/documents/2024-12/2026-pgp.pdf).

[10] U.S. Env't Prot. Agency, CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS), EPA, https://www.epa.gov/cwa-methods/cwa-analytical-methods-and-polyfluorinated-alkyl-substances-pfas (last updated Nov. 19, 2025).

1314(b)(1)(B) (requiring consideration of specified factors, including cost, when determining measures applicable to point sources required to meet effluent limitations); 51 Fed. Reg. 24974-01 (July 9, 1986) (establishing cost-effectiveness benchmarks for POTWs and industry when setting effluent limitations).

EPA dismissed HSC's pragmatic implementation costs data on a medium sized wastewater treatment plant. By overlooking these statutory and regulatory considerations—and by failing to grapple with implementation costs—EPA departs from the CWA's established framework for setting and enforcing permit obligations.

Furthermore, the example cited by EPA in Response 1 asserts that HSC's estimate of 209 tests for nitrogen should only be 70 (35 TKN and 35 Nitrate + Nitrite). That is false because the Nitrate and Nitrite tests used by HSC are distinct and have separate costs. No other justification or reasoning is given by EPA. The response simply concludes that "there appear to be several other mistakes or exaggerations," but no more analysis is set forth to dispense of HSC's data collection, which demonstrates substantial cost increases. *See* Ex. 4, Response to Comments at 6-8.

By deflecting HSC's concerns and citing to its "broad authority under the CWA and NPDES regulations," the Permit ignores the substantial impact the increased costs will have on HSC's ratepayers. *Id.*

### CONCLUSION

For the foregoing reasons, HSC respectfully requests this Court remand the NPDES General Permit for New Hampshire Medium Wastewater Treatment Facilities to EPA for review and modification.

.

19

Dated: February 24, 2026

Respectfully submitted,

**HOOKSETT SEWER COMMISSION**

By its Attorneys,

 */s/ Robert R. Lucic*
Robert R. Lucic, Bar No. 24338
SHEEHAN PHINNEY BASS & GREEN PA
1000 Elm Street, P.O. Box 3701
Manchester, NH 03105-3701
(603) 627-8188
rlucic@sheehan.com

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on February 24, 2026, I electronically filed the above Petition for Review.

 */s/ Robert R. Lucic*
Robert R. Lucic

|  | ) |  |
|---|---|---|
| Hooksett Sewer Commission, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Petition for Review |
| | ) | |
| United States Environmental | ) | |
| Protection Agency, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## PETITIONER'S RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. and Circuit Rule 26.1, the undersigned, counsel for Petitioner, Hooksett Sewer Commission Wastewater Treatment Facility ("HSC"), certifies as follows:

HSC is an independent political body established by a vote of the legislative body in the Town of Hooksett, New Hampshire in 1967. HSC, deriving its statutory authority from RSA §149-I, *et seq*., consists of three commissioners, each elected by the Town voters to a three-year term. HSC is principally charged with maintaining sewer lines and a wastewater treatment center, expanding infrastructure as necessary to meet town demands, complying with state and federal law, and assessing user rates and collecting amounts due.

HSC is a self-sustaining entity, funded by the collection of sewer rentals from users of the sewer system and collected in the sewer fund. RSA 149-I:10 dictates how the

sewer fund must be organized and distributed.  Funds received from the collection of sewer rentals must be kept in a separate and distinct fund from all other municipal funds; the fund must be allowed to accumulate from year to year; the fund must not be comingled with town tax revenues; the fund must not be deemed part of the town's general fund of accumulated surplus; and the fund must only be expended for the purposes specified in RSA 149-I:8 or for the previous expansion or replacement of sewage lines or treatment facilities.  *See* RSA 149-I:10, I.  RSA 149-I imposes robust safeguards on how sewer funds are managed and spent.  While the sewer funds are held in the custody of the town treasurer, the treasurer may only pay out amounts from the sewer fund upon an authorizing order of the Commission.  *See* RSA 149-I:10, II.  Any expenditures of the sewer fund by the Commission, however, must only be within the amounts appropriated by the legislative body, i.e., at the town meeting.  *See* RSA 149-I:10, II.  The sewer commission must also pay the town for the cost of municipal services used in support of the sewer operations.  *See* RSA 149-I:10, II.

With the creation of HSC under RSA 149-I, the voters also voted to create a sewer system and a wastewater treatment facility that discharges into the Merrimack River.  Inherent in the operation of a sewer system and wastewater treatment facility are regulatory obligations that HSC must meet.  Specifically, the Commission is regulated by a number of state and federal permits, including, its National Pollutant Discharge Elimination System ("NPDES") permit, regulated by the Region 1 of the Environmental Protection Agency ("EPA"), and its air and biosolids permits, both regulated by the New Hampshire Department of Environmental Services ("NHDES").  Each permit requires the Commission to comply with regulatory obligations, including inspections, monitoring,

and testing. These regulatory obligations are simultaneously independent of the obligations that the Commission owes to its ratepayers and the Town of Hooksett to maintain and operate the sewer system and inseparable from the Town's decision to construct a wastewater treatment facility that discharges into a navigable body of water.

Dated: February 24, 2026     Respectfully submitted,

**HOOKSETT SEWER COMMISSION**

By its Attorneys,

 */s/ Robert R. Lucic*
Robert R. Lucic, Bar No. 24338
SHEEHAN PHINNEY BASS & GREEN PA
1000 Elm Street, P.O. Box 3701
Manchester, NH 03105-3701
(603) 627-8188
rlucic@sheehan.com

## CERTIFICATE OF SERVICE

I certify that on February 24, 2026, I electronically filed the above Petition for Review.

 */s/ Robert R. Lucic*
Robert R. Lucic



EXHIBIT 1

conditions; and

(2) A calculation of the maximum daily, weekly, and monthly infiltration and the maximum daily, weekly, and monthly inflow for the reporting year.

## D. ALTERNATE POWER SOURCE

In order to maintain compliance with the terms and conditions of this permit, the Permittee and Co-permittee shall provide an alternative power source(s) sufficient to operate the portion of the publicly owned treatment works it owns and operates, as defined in Part V.E.1 of this permit.

## E. INDUSTRIAL USERS

The following requirements only apply to dischargers that are not required to conduct an Industrial Pretreatment Program (IPP). This section applies to all eligible WWTFs except Dover, Somersworth, Jaffrey, Milford, Derry, Merrimack and Claremont.

1. The Permittee shall submit to EPA and the State (for Penacook: and to the City of Concord) the name of any Industrial User (IU) subject to Categorical Pretreatment Standards under 40 CFR § 403.6 and 40 CFR chapter I, subchapter N (Parts 405-415, 417-430, 432-447, 449-451, 454, 455, 457-461, 463-469, and 471 as amended) who commences discharge to the facility after the effective date of this permit.

   This reporting requirement also applies to any other IU who is classified as a Significant Industrial User which discharges an average of 25,000 gallons per day or more of process wastewater into the facility (excluding sanitary, noncontact cooling and boiler blowdown wastewater); contributes a process wastewater which makes up five (5) percent or more of the average dry weather hydraulic or organic capacity of the facility; or is designated as such by the Control Authority as defined in 40 CFR § 403.3(f) on the basis that the industrial user has a reasonable potential to adversely affect the wastewater treatment facility's operation, or for violating any pretreatment standard or requirement (in accordance with 40 CFR § 403.8(f)(6)).

2. In the event that the Permittee receives originals of reports (baseline monitoring reports, 90-day compliance reports, periodic reports on continued compliance, etc.) from industrial users subject to Categorical Pretreatment Standards under 40 CFR § 403.6 and 40 CFR chapter I, subchapter N (Parts 405-415, 417-430, 432-447, 449-451, 454, 455, 457-461, 463-469, and 471 as amended), or from a Significant Industrial User, the Permittee shall forward the originals of these reports within ninety (90) days of their receipt to EPA, and copy the State (for Penacook: and to the City of Concord).

3. In accordance with 40 CFR § 122.44(j)(1) the Permittee must identify, in terms of character and volume, any SIUs discharging into the POTW or facility subject to Pretreatment Standards under section 307(b) of CWA and 40 CFR Part 403. SIUs

information shall be updated at a minimum of once per year or at that frequency necessary to ensure that all SIUs are properly permitted and/or controlled. The records shall be maintained and updated as necessary.

4. Beginning the first full calendar year after the effective date of the authorization, the Permittee shall conduct or require annual sampling of the following types of industrial discharges into the POTW:

- Commercial Car Washes
- Platers/Metal Finishers
- Paper and Packaging Manufacturers
- Tanneries and Leather/Fabric/Carpet Treaters
- Manufacturers of Parts with Polytetrafluoroethylene (PTFE) or teflon type coatings (i.e. bearings)
- Landfill Leachate
- Centralized Waste Treaters
- Known or Suspected PFAS Contaminated Sites
- Fire Fighting Training Facilities
- Airports
- Any Other Known or Expected Sources of PFAS

Sampling shall be conducted using Method 1633A for the PFAS analytes listed in Attachment H. The industrial discharges sampled and the sampling results shall be summarized and submitted to EPA and the State as an electronic attachment to the March discharge monitoring report due **April 15** of the calendar year following the testing.

## F.  INDUSTRIAL PRETREATMENT PROGRAMS

The following requirements only apply to dischargers that are required to conduct an Industrial Pretreatment Program (IPP). This section applies only to the following WWTFs: Dover, Somersworth, Jaffrey, Milford, Derry, Merrimack and Claremont.

1. Legal Authority

The Permittee has been delegated primary responsibility for enforcing against discharges prohibited by 40 CFR 403.5 and applying and enforcing any national Pretreatment Standards established by the United States Environmental Protection Agency in accordance with Section 307 (b) and (c) of The Clean Water Act (Act), as amended by The Water Quality Act (WQA), of 1987.

The Permittee shall operate an industrial pretreatment program in accordance with the General Pretreatment Regulations found in 40 CFR Part 403 and the approved pretreatment program submitted by the Permittee. The approved pretreatment program, and any



EXHIBIT 2

instead make a permittee responsible for the quality of the water in the body of water into which the permittee discharges pollutants."

Rather than including any provisions that may be considered "end-result" requirements in this General Permit, EPA's permitting approach includes several new permit requirements (as described on pages 6, 8-9 and 36-41 of the Fact Sheet) designed to gather information needed to establish requirements and/or effluent limitations on the discharge in the future. The comment does not address this approach. EPA notes that this approach is in accord with the recommendations of the Supreme Court decision. Specifically, page 20 of the decision concludes with the following statement:

> "In sum, we hold that §1311(b)(1)(C) does not authorize the EPA to include 'end-result' provisions in NPDES permits. Determining what steps a permittee must take to ensure that water quality standards are met is the EPA's responsibility, and Congress has given it the tools needed to make that determination. If the EPA does what the CWA demands, water quality will not suffer."

In this case, EPA has determined that the monitoring requirements described in the sections of the Fact Sheet mentioned above are necessary steps that the CWA demands to ensure sufficient information is available to protect water quality.

The comment also suggests that the new permit requirements should not be more stringent than the existing permit requirements based on unfinalized regulatory changes. To the extent this refers to the Supreme Court decision itself, EPA notes that the case has been finalized but is not a regulatory change and EPA is not aware of any regulatory changes that may be implied here. In any case, EPA disagrees that the new permit may not be more stringent than the existing permit and reiterates that EPA must include whatever requirements are necessary to protect water quality. *See* CWA § 301(b)(1)(C).

**Comment 6**

As reflected in the substantive comments, the overarching concern is with the expected costs imposed upon a small municipal wastewater treatment facility and the resident ratepayers by the additional requirements imposed by the Draft Permit.

Many of the requirements of concern relate to monitoring of PFAS and adsorbable organic fluorine. As indicated above, HSC objects to monitoring requirements that are not based upon finalized rulemaking under the Clean Water Act. The Fact Sheet itself acknowledges that the relevant rulemaking is still pending. Until USEPA finalizes validated testing methods with documented accuracy and precision, monitoring requirements should not be included in the Draft Permit. Furthermore, Hooksett currently does not have and should not be required to have an Industrial Pretreatment Program given the lack of an approved testing mechanism and the substantial costs related to testing of individual connections in the collection system.

**Response 6**

EPA recognizes that the General Permit includes a variety of new monitoring requirements and that these may result in cost increases. Given that many of the eligible WWTFs have permits which expired many years ago, EPA acknowledges that there are various differences in monitoring frequencies and other standard permit requirements in the existing individual permits.

EPA notes that these PFAS and AOF monitoring requirements will ensure that EPA obtains the necessary information for the next permit reissuance. As a general note, EPA has broad authority under the CWA and NPDES regulations to prescribe the collection of data and reporting requirements in NPDES Permits. *See* CWA § 308(a)(A), 33 U.S.C. § 1318(a)(A) (specifying that permittees must provide records, reports, and other information EPA reasonably requires); CWA § 402(a)(2), 33 U.S.C. § 1342(a)(2) (requiring permittees to provide data and other information EPA deems appropriate); 40 CFR § 122.41(h) (permittees shall furnish "any information" needed to determine permit compliance); 40 CFR § 122.44(i) (permittees must supply monitoring data and other measurements as appropriate); *see also, e.g., In re City of Moscow*, 10 E.A.D. 135, 170-71 (EAB 2001) (holding that EPA has "broad authority" to impose information-gathering requirements on permittees); *In re Town of Ashland Wastewater Treatment Facility*, 9 E.A.D. 661, 671-72 (EAB 2001) (holding that CWA confers "broad authority" on permit issuers to require monitoring and information from permittees); *In re Avon Custom Mixing Services, Inc.*, 10 E.A.D. 700, 708 (EAB 2002) ("The Board has emphasized that monitoring data play a crucial role in fulfilling the objectives of the CWA and its implementing regulations."); *Id.* at 709 ("where the monitoring relates to maintaining State water quality standards… nothing in the CWA or the implementing regulations constrain the Region's authority to include monitoring provisions.").

As discussed in the Fact Sheet at 48, the purpose of this monitoring and reporting requirement is "to better understand potential discharges of PFAS from this facility and to inform future permitting decisions, including the potential development of water quality-based effluent limits on a facility-specific basis." These permitting decisions may include whether there is reasonable potential to cause or contribute to a violation of the State water quality standards in the next permit reissuance, and if there is, to inform the development of numeric effluent limits or pollutant minimization practices, or some combination."

Regarding the test methods, see Response 11 below.

Regarding the Industrial Pretreatment Program (IPP), EPA confirms that Hooksett does not have an IPP under this General Permit. The PFAS monitoring of industrial users does not constitute a pretreatment program. However, EPA considers it necessary to sample the categories of industrial users identified in the permit at least once per year to identify the specific sources of PFAS and to inform future decisions regarding source reduction. EPA notes that the Permittees may incorporate requirements on industrial users through regulatory mechanisms such as local limits, pretreatment programs, industrial discharge

permits, and/or sewer use ordinances. Such requirements may include annual PFAS monitoring. Thus, the Permittees may transfer all or part of the monitoring responsibilities associated with this monitoring requirement to specific industrial users, as the Permittees deem appropriate.

**Comment 7**

The extensive requirements for adaptation planning are another major area of concern. The Draft Permit exceeds USEPA's statutory authority to require Adaptation Planning. The Draft Permit relies on USEPA's authority under 40 C.F.R. §122.41(e) to require "proper operation and maintenance" of facilities such as the Hooksett Wastewater Treatment Facility. The statutory basis upon which USEPA relies refers to a grant program for eligible facilities and does not create a mandate for the unfunded and costly planning process set forth in the Draft Permit. Furthermore, in light of *Loper Bright Enterprises v. Raimondo,* Case Number 22-451 (June 28, 2024), deference to an agency's interpretation of its own authority is no longer presumed.

> **Response 7**
>
> See Response 2.

**Comment 8**

The Draft Permit also sets forth an aluminum limit which is no longer necessary or valid. The limit set was based on pre-2020 data which reflected a treatment technology no longer in use at the Facility. It is inappropriate to utilize non-permit related plant operations data or WET testing data to establish effluent quality or background levels of pollutants in receiving waters when setting permit limits. The aluminum limit should be eliminated since it is not based on an exceedance of a water quality limit.

> **Response 8**
>
> See Response 17.

**Comment 9**

With respect to pH, USEPA has previously approved an effluent pH range of 6.0 to 8.0 S.U. That range has been in place since 2012. HSC requests that the RSC-specific table be modified to include the previously approved effluent pH range of 6.0 to 8.0 S.U. rather than 6.5 to 8.0 S.U.

> **Response 9**
>
> EPA notes that NHDES requires a pH study to be conducted each permit reissuance to demonstrate that the expanded pH range will comply with water quality standards based on all updated environmental conditions. As noted on page 20 of the Fact Sheet, "The pH range may be modified if the Permittee satisfies conditions set forth in the General Permit which ensures that an expanded range (no wider than 6.0 to 9.0 S.U.) would not cause or contribute to an excursion of water quality standards. Upon notification of an approval by NHDES, EPA will review and, if acceptable, will submit written notice to the

# EXHIBIT 3

4. Schedules of Compliance

The Permittee will have a schedule of compliance for any newly established or more stringent water quality-based effluent limits which EPA has determined the Permittee is not expected to be in compliance with upon the effective date of the authorization to discharge under the General Permit. The applicable Permittees and limits are listed below (see also Attachment E for the numeric values of these limits).

For 2-year compliance schedules (noted below), the Permittee shall evaluate optimization, source reduction, and/or minor process change in the first year and implement these findings in the second year.

For 4-year compliance schedules (noted below), the Permittee shall evaluate options for meeting the limit (including facility upgrades) in the first year, design in the second year, and complete construction and optimization in the 3rd and 4th years.

For compliance schedules with a unique date (noted below), these schedules are carried forward from the current individual permit and/or administrative order (AO). The Permittee shall achieve compliance with the limit by the date indicated.

During the compliance schedule, the Permittee shall report monitoring results (for newly established limits) or comply with an interim limit equivalent to the existing effective limit in their previous permit (for limits becoming more stringent).

   a. Durham: Copper (2-yr)
   b. Somersworth: Aluminum (2-yr)
   c. Lincoln: Aluminum (2-yr), Total Phosphorus (2-yr)
   d. Milford: Copper (2-yr), Ammonia (2-yr, cold and warm)
   e. Merrimack: Copper (2-yr)
   f. Claremont: Aluminum (2-yr)
   g. Newport: Total Phosphorus (7/1/2027, based on AO)
   h. Littleton: Copper (2-yr)
   i. Hanover: Total Nitrogen (4-yr)
   j. Dover: *Enteroccoci* (2-yr, daily maximum only)

Finally, every twelve (12) months (beginning on the effective date of the authorization to discharge under the General Permit and ending upon the completion of the compliance schedule), the Permittee shall submit to EPA and NHDES (as an electronic attachment to the DMR) a status report relative to their progress toward achieving the permit limit.

5. Toxicity Violation Procedures

   a. Accelerated WET Testing

The Permittee shall conduct at least two accelerated re-tests at 14-day intervals which must be started within 14 days and 28 days of receiving the results below, or as soon as possible thereafter based on factors outside the Permittee's control (*e.g.*, limited lab availability). The Permittee must document the justification for any re-tests conducted after these timeframes and include the justification with the re-test results.

- any WET test results in a violation of any WET limit and the test acceptability criteria were met (only re-test for the species that failed); or

- the Permittee identifies or is provided notice of a sudden and significant death of large numbers of fish and/or shellfish in the vicinity of the discharge that may have been due to the discharge (test for all species identified in permit).

The Permittee shall develop a Toxicity Response Plan with a list of local/state fish and wildlife officials and/or environmental emergency responders. If the Permittee identifies a sudden and significant death of large numbers of fish and/or shellfish in the receiving water that is not likely caused by the discharge, the Permittee should notify the appropriate officials who can investigate and address the environmental concern most expeditiously.

If the receiving water was used as the dilution water and is suspected to be toxic (*e.g.*, based on results from the initial test), the Permittee shall conduct the accelerated WET tests using laboratory water as the dilution water with a similar pH and hardness as the receiving water. If the WET tests using laboratory water do not violate any WET limits, the Permittee shall return to a normal monitoring frequency but should request to continue to use laboratory water as the dilution water based on these results. If either accelerated WET test violates any WET limits (and the test acceptability criteria were met), the discharge is considered to have persistent toxicity and the Permittee must immediately initiate a Toxicity Identification Evaluation and Toxicity Reduction Evaluation (TIE/TRE) in accordance with subpart b below to resolve any toxic impacts on the receiving water.

b.    TIE/TRE

(1) If the WET re-test described above results in a violation of the WET limits, the Permittee must immediately initiate a TIE/TRE designed to identify and reduce toxicity in the discharge. Notice of TIE/TRE study implementation is to be submitted to EPA (via email: R1NPDESReporting@epa.gov) and NHDES within 10 days of receiving notification of WET re-test failure.

(2) A TIE/TRE schedule and action plan must be submitted to EPA and NHDES as an electronic attachment to the DMR within 60 days of receipt of WET re-test

failure.

The TIE/TRE schedule (from the initiation date to the termination date) should be as short as possible, and no longer than 24 months as follows: The "TIE/TRE initiation date" is the date of the receipt of results for the toxicity test that confirms persistent toxicity and the "TIE/TRE termination date" is the date corrective actions to resolve toxicity are identified and a schedule for completing these corrective actions is proposed.

The objective of the action plan is to identify the source(s) of toxicity by analyzing toxicity testing samples for any toxicant identified as being a potential source of toxicity and ascertaining whether the same level of toxicity occurs when any suspected toxicant level varies. This information might lead to finding one or more toxicants or confirming or eliminating suspected toxicants and possibly their source(s).

(3) Quarterly "TIE/TRE Progress Reports" should be submitted to EPA and NHDES as an electronic attachment to the DMR at the end of each quarter after the TIE/TRE initiation date. The progress report should list all activities and findings related to resolving toxicity, including all WET and chemical test data. The data summaries of the TIE/TRE also should be provided in a tabulated format with explanations of the procedures used and the recorded findings from the study.

(4) A "Final TIE/TRE Report" should be submitted to EPA and NHDES within 45 days of the TIE/TRE termination date (as an electronic attachment to the DMR) and should summarize the TIE/TRE activities and findings, propose the corrective action(s) to be taken, and propose a schedule to complete any identified corrective action(s).

(5) After submission of the "Final TIE/TRE Report," the Permittee shall continue to submit quarterly "Toxicity Reduction Progress Reports" (as an electronic attachment to the DMR) documenting progress on the corrective actions being taken to reduce toxicity in accordance with the proposed schedule.

(6) Upon completion of all corrective actions identified in the "Final TIE/TRE Report," the Permittee shall submit a "Toxicity Reduction Completion Report" (as an electronic attachment to the DMR) summarizing the corrective actions taken based on the TIE/TRE and shall include all information necessary to demonstrate that the discharge is no longer toxic and consistently complies with all WET limits.

# EXHIBIT 4

## II. Responses to Comments

Comments are reproduced below as received; they have not been edited.

## A. Comments from the Town of Hooksett, on January 22, 2025.

### Comment 1

Thank you for the opportunity to provide comments on the Draft Medium General Permit for Hooksett. The purpose of this letter is to provide an estimate of Hooksett WWTF's anticipated cost over a twenty-year period if all these new testing and adaptation requirements are met.

### WWTF Updates

Hooksett has taken a very proactive approach to maintaining and upgrading their treatment plant, lift stations, and collection system. We have installed at the treatment facility all new headworks, IFAS tanks modifications, Aeration blower piping, Scada based aeration control valves, hydraulic flow through the plant, clarifier mechanical, automated need paced chemical dosing, and a solar power generation field. We are currently undertaking upgrading our solids handling from a belt filter press to two screw presses.

We are currently updating our Golden Gate and Merrimack Street pump stations with all new electrical, energy efficient pumps, and a generator at Golden gate. A new force main has been designed from our Martins Ferry Pump Station to the treatment plant-it is scheduled to bid next month. The new force main is being relocated away from the Merrimack River as a safety measure against both flooding and an SSO to the river.

All the monies spent on these upgrades and improvements are based upon long-term cost savings, better wastewater treatment, resiliency, and leveling the cost to our ratepayers. Hooksett WWTF is solely funded by sewer user fees and rates and operated as an Enterprise Fund. This does not permit operating by raising taxes. The extensive testing and adaptation planning in this permit does not affect any changes to anything except add cost to our ratepayers.

### Testing & Reporting Cost Implications

Our current testing and reporting on our permit keep us well within current regulations and limits. The amount of extra testing reads like a plant having process or permit violation issues- Hooksett does not have either of those issues. Testing of the river should fall under costs incurred by USEPA or NHDES, not each individual plant. The permit currently in draft would require an additional 456 tests, 134 new reports, and 503 man hours to complete. The total cost to our ratepayers for this level of testing and reporting is approximately $200,000- $1.00 per thousand gallons. That would be an 8.8% increase to rates with no value added to the ratepayers. We see this as an extraordinary cost for a fishing expedition by regulators. (see appendix 1).

> #### Response 1
>
> EPA acknowledges that all testing and reporting requirements have a modest cost, however, EPA has only included those requirements deemed necessary to ensure data are available to support EPA's future permitting decisions for the protection of water

quality standards. As a general note, EPA has broad authority under the CWA and NPDES regulations to prescribe the collection of data and reporting requirements in NPDES Permits. *See* CWA § 308(a)(A), 33 U.S.C. § 1318(a)(A) (specifying that permittees must provide records, reports, and other information EPA reasonably requires); CWA § 402(a)(2), 33 U.S.C. § 1342(a)(2) (requiring permittees to provide data and other information EPA deems appropriate); 40 CFR § 122.41(h) (permittees shall furnish "any information" needed to determine permit compliance); 40 CFR § 122.44(i) (permittees must supply monitoring data and other measurements as appropriate); *see also, e.g., In re City of Moscow*, 10 E.A.D. 135, 170-71 (EAB 2001) (holding that EPA has "broad authority" to impose information-gathering requirements on permittees); *In re Town of Ashland Wastewater Treatment Facility*, 9 E.A.D. 661, 671-72 (EAB 2001) (holding that CWA confers "broad authority" on permit issuers to require monitoring and information from permittees); *In re Avon Custom Mixing Services, Inc.*, 10 E.A.D. 700, 708 (EAB 2002) ("The Board has emphasized that monitoring data play a crucial role in fulfilling the objectives of the CWA and its implementing regulations."); *Id.* at 709 ("where the monitoring relates to maintaining State water quality standards… nothing in the CWA or the implementing regulations constrain the Region's authority to include monitoring provisions."). EPA requires monitoring necessary to characterize the discharge, sludge and receiving water(s) and ensure sufficient data are available for future permitting decisions.

Further, EPA may require monitoring even when corresponding water quality criteria have not yet been established. *E.g. In re Town of Concord*, 16 E.A.D. 514, 541-542 (EAB 2014) (EPA may impose monitoring requirements "regardless of a pollutant's potential to cause or contribute to a water quality violation, and regardless of whether pollutant discharges are restricted by an effluent limit.") In fact, Congress specifically contemplated that EPA would require monitoring to, among other things, "assist in the development" of standards and limitations under the Act. CWA § 308(a). To this end, data collected from a permit's monitoring requirements is often critical in future permit cycles in determining the need for effluent limitations and, if appropriate, calculating effluent limitations. It is reasonable to require monitoring when there is "little data" otherwise available. *In re Avon Custom Mixing Services*, 10 E.A.D. 700, 709 (EAB 2002).

However, EPA has also carefully considered all comments submitted on the Draft General Permit and, in some cases, has made changes that may alleviate some of these costs. See list of changes above.

With respect to this specific commenter (Hooksett), EPA also notes that this permit was last issued in 2013. Therefore, this new permit incorporates 12 years of permitting updates which EPA acknowledges will result in several new testing and reporting requirements given that the scope of pollutants of concern and available data has expanded over these years. However, EPA reviewed the list of new tests and reports summarized in Appendix 1 of the comment (not reproduced here) and finds what appear to be several mistaken or exaggerated estimates.

Regarding tests, one example is that the spreadsheet estimates 209 tests (of the total 456) for nitrogen, as follows: TKN (35), Nitrate (35), Nitrite (35), Total Nitrogen (52), and Rolling Annual Total Nitrogen (52). EPA estimates that the Draft General Permit requires approximately 35 TKN tests per year and 35 Nitrate + Nitrite (measured together using one sample) tests per year. Total nitrogen and rolling annual average total nitrogen are then calculated based on those TKN and Nitrate + Nitrite results, so the total number of tests annually is 70 (*i.e.*, 139 fewer than estimated in the appendix). Further, the spreadsheet attempts to subtract the number of tests in the 2013 Permit but, in fact, does not subtract anything. Therefore, the estimate of 456 annual tests actually represents the total number of tests and not the total number of "additional" tests as suggested by the comment.

Regarding reports, the spreadsheet includes 66 annual reports for nitrogen (out of the total estimate of 134). EPA is not aware of any nitrogen-specific reports in the permit (other than 12 monthly DMR submissions which include nitrogen and most other regulated pollutants in one monthly report). Further, the spreadsheet does not appear to even estimate the number of reports in the 2013 Permit (to subtract them) but still refers to the estimated 134 reports as "new" reports.

Although EPA has not flagged them here, there appear to be several other mistakes or exaggerations that do not seem to match the actual permit requirements. Rather, EPA simply concludes that this comment significantly overestimates the costs associated with this permit reissuance.

**Comment 2**

**Adaptation Planning and Implementation Cost Implications**
The adaptation planning and implementation is going to be extremely costly for Hooksett WWTF. This plant has not in its existence had any flooding issues. Planning for a once-in-a-lifetime event may seem prudent on paper but the actual planning and implementation will most likely prove to be an exercise in futility. If we plan for three feet above the 100-year flood mark and we get the 500-year flood we will most likely be inundated with water anyhow. Most flooding events, like those we have seen in Vermont and northern New Hampshire in recent years, come without notice or time to get your flood protections in place. After flood protection is in place accessing the plant or escaping from the plant before the water rises high enough to trap personnel is problematic. If the plant loses electrical power the solar field automatically disconnects, and the generator starts. We have enough fuel for seven days in our tank-if flood waters don't recede before power is restored, we would be inundated. The estimated cost to implement this for Hooksett WWTF is $46,000,000.00 at today's cost. With planning for the next five years and then an implementation schedule for say the five years following that-prices could easily double estimates. If it started today and a $50,000,000 loan at 3.5% was approved, the increase in rates would be $9.30 per thousand gallons on top of the rate existing. That increase would be a 126% jump in rates. (see appendix 2).



EXHIBIT 5

Permittee must use Methods 1633 and 1621, respectively. Based on this comment, EPA agrees that the most recent revision of Method 1633 is referred to as Method 1633A (which addresses minor editorial issues and clarifies several technical concerns). Therefore, EPA has updated the Final General Permit to require Method 1633A until a method is approved in Part 136.

Regarding Method 1621, EPA recognizes that this method is a screening method for wastewater. As noted on page 44 of the Fact Sheet, "Given the future regulatory uncertainty and that this AOF monitoring will screen for a broader range of organofluorines, such as PFAS and other emerging contaminants, EPA considers it appropriate to monitoring for AOF as well as PFAS to ensure the discharge is fully characterized with respect to these pollutants in the next permit reissuance." Therefore, this monitoring requirement will remain in the Final General Permit. However, EPA agrees that Method 1621 specifies units of µg/L, so EPA has updated the Final General Permit to include these units rather than ng/L.

**Comment 12**

The current EPA's position nationally was only to have wastewater treatment plants 10 MGD or larger to begin testing for PFAS and Adsorbable Organic Fluorine. EPA has a heavily populated website on the 'POTW Influent PFAS Study' ([POTW Influent PFAS Study | US EPA](#)). There was an initial Register notice posted on March 26, 2024, with comments to be received by May 28, 2024 ([Federal Register :: Proposed Information Collection Request; Comment Request; POTW Influent](#) [PFAS Study Data Collection](#)). In this notice, questionnaires were to be sent to 400 of the largest WWTPs out of the 12,000 (2.7% of the total WWTPs) in the US. Mandatory responses were required and subsets of 200 – 300 plants would be asked to conduct specific sampling in two phases. The Phase One expectation cited, "*Phase 1 will require each selected POTW to collect and analyze one-time grab samples of industrial user effluent, domestic wastewater influent, POTW influent, and POTW effluent for forty specific PFAS and adsorbable organic fluorine (AOF). For each POTW selected, the EPA intends to specify no more than ten industrial users for which the POTW must collect and analyze effluent samples. The total number of industrial users sampled as part of the sampling program is not expected to exceed 2,000 facilities. Phase 2 will require selected POTWs to collect and analyze one-time grab samples of sewage sludge for forty specific PFAS and ancillary parameters.*" At 200 subset plants with 2,000 industrial facilities equates to 2,200 tests. If it is 300 facilities it is 2,300 tests. In the Phase I Study the EPA calls for a one-time grab of the industrial user's effluent (2,000 tests) and a one-time grab of the plant's influent and effluent (400 to 600) tests. At most there will be 2,600 tests run in phase I. EPA estimates that Phase I will get underway in 2025. The Office of Management and Budget did a cost analysis for the above study.[6] The treatment plants would need to dedicate 25,640 hours for 5.5 million dollars. That is only administrative costs and sampling field work. That amounts to $2,115.38 for each of the 2,600 tests run in phase 1. The current cost for one PFAS sample is approximately $500.00. The cost for AOF is approximately $440.00. The total cost per test is $3,055.38. At 22 required tests annually (12 for the plant, inf, eff, sludge, and anticipate 10 industries) for each MGP the cost to each MGP WWTP would be $67,218.36 per year.

[6] 2799ss01 – OMB

The EPA further outlines in the comments that the <u>participants will be divided into four categories.</u> *"Phase I sampling will be staggered in order to distribute demand for environmental laboratories completing sample analysis. The EPA will divide the POTWs selected for wastewater sampling into four groups that contain 50-75 POTWs located across the nation. Groups will sample sequentially (i.e., Group 1 will sample and submit results to the EPA, then Group 2 will sample and submit results to the EPA, etc.)* <u>*over a 16-month period.*</u>*"  That would be around 700 PFAS/AOF samples per quarter nationwide. The* EPA is expecting the 21 medium plants to analyze influent, effluent, and sludge once per quarter along with one sample from potential industries (estimate 10 per facility from the list in Item 4 on page 17 of 28 in the Medium General Permit).  That would be 462 PFAS samples from small plants.  This is an extreme overreach by the regulatory agency and does not comport with the Register Notice of the Phase I and Phase II PFAS/AOF nationwide study. It will also swamp the analytical laboratories as noted by EPA.

A second Federal Register Notice was issued on October 10, 2024, with comments due by November 12, 2024, ([Federal Register :: Agency Information Collection Activities; Submission to](#) [the Office of Management and Budget for Review and Approval; Comment Request; Publicly](#) [Owned Treatment Works (POTW) Influent Per- and Polyfluoroalkyl Substances (PFAS) Study and](#) [National Sewage Sludge Survey (NSSS) (New)](#)).  More specifics were included with this posting including leaving the POTW size at >10 MGD, the EPA was still looking at 400 facilities participating and now the population size of > /= 50,000 service population was added.  Also, note that the study was to include only 10 industrial facilities from each of the participating WWTPs.  Merrimack has approximately 28,000 residents and certainly, none of the 21 facilities that will participate in this Medium General Permit have a population of 50,000 service customers.

EPA cites this study in the above roadmap expectation in their November 2024 Annual PFAS update release titled, *'EPA's PFAS Strategic Roadmap': Three Years of Progress,*[7] *"The EPA is also moving forward with a nationwide study of PFAS influent and sewage sludge at wastewater treatment facilities and is expected to publish updates on its information collection request in the near future before beginning a two-year study effort.* It is obvious this is step one and that the information gathered from the >10 MGD study may set parameters for Medium and Small General Permit WWTPs in a future NPDES issuance.

Hooksett includes the following information from the EPA's PFAS Sampling Plan for 200 – 300 WWTPs > 10 MGD as this information will be referenced in the comments in the aluminum section.

[7] epas-pfas-strategic-roadmap-2024_508.pdf

**Sampling[8]**

*The EPA will use the information and data collected in the questionnaire to select 2,000 industrial users to be sampled by 200 to 300 POTWs. Each POTW selected for sampling will be required to collect the following:*

- *10 samples on average from different industrial users (IUs) selected by the EPA*
- *A domestic sample*
- *POTW influent and effluent samples*
- *QC samples*

*The EPA will provide a sampling plan with detailed information on what is required of selected POTWs and how to complete the sampling. As part of sampling, POTWs will be responsible for the following:*

- *obtaining sampling supplies*
- *contracting labs for analysis*
- *collecting samples specified by the EPA*
- *notifying EPA when samples are submitted for analysis*
- *reviewing and compiling the sample results in the specified format*

*In an effort to both improve lab capacity and reduce costs associated with analyzing wastewater samples from 200 to 300 POTWs simultaneously using EPA Methods 1633 and 1621, the EPA will stagger sampling and analysis.*

*Selected POTWs for sampling and analysis will be broken up into 4 groups, with each group containing a geographical spread of POTWs from across the country. All samples will be grab samples. Samples will be analyzed using EPA Method 1633, which measures 40 PFAS analytes, and EPA Method 1621, which measures adsorbable organic fluorine (AOF).*

*EPA intends to conduct the study (which has yet to begin as final Phase II comments were recently submitted by the November 12, 2024 deadline and the Annual PFAS Report (indicates the finalization of the study is at least 2 and ½ years out) and the target WWTP parameters are > 10 MGD with a service population of 50,000 or greater.  The study only includes large WWTPs with one influent and effluent test and not the quarterly PFAS/AOF requirements as outlined in this draft MGP.  The Town of Hooksett respectfully requests that all PFAS and Adsorbable Organic Fluorine sampling and reporting requirements be removed from the final issued MGP590012 NPDES Permit.*

[8] EPA's PFAS Study Design Section on this website - POTW Influent PFAS Study | US EPA

### Response 12

EPA does not consider that the scope of a nationwide study would somehow limit EPA's ability to collect necessary PFAS and AOF data from each Permittee. As noted in Response 6, EPA finds that this monitoring is necessary.

# EXHIBIT 6

## II.  GENERAL PERMIT REQUIREMENTS

### A.  EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS

1.  During the period beginning on the effective date and lasting through the expiration date, the Permittee is authorized to discharge treated effluent from a wastewater treatment facility (WWTF) treating domestic sewage. The discharge shall be limited and monitored as specified below at the end of all treatment processes, including disinfection or dechlorination, or at an alternative representative location approved by EPA and the New Hampshire Department of Environmental Services (NHDES), that provides a representative sample of the effluent. The receiving water and the influent shall be monitored as specified below.

| Effluent Characteristic | Discharge Limitation[15] | | | Monitoring Requirement[1,2,3] | |
|---|---|---|---|---|---|
| Parameter | Average Monthly | Average Weekly | Maximum Daily | Measurement Frequency | Sample Type[4] |
| Effluent Flow[5] | Rolling Annual Average Limit MGD | --- | --- | Continuous | Recorder |
| Effluent Flow[5] | Report MGD | --- | Report MGD | Continuous | Recorder |
| BOD$_5$[7] | 30 mg/L Limit[6] lb/day | 45 mg/L Limit[6] lb/day | 50 mg/L Report lb/day | 2/Week | Composite |
| CBOD$_5$[7] | 25 mg/L Limit[6] lb/day | 40 mg/L Limit[6] lb/day | 45 mg/L Report lb/day | 2/Week | Composite |
| BOD$_5$ (or CBOD$_5$ [7]) Removal | ≥ 85 % | --- | --- | 1/Month | Calculation |
| TSS | 30 mg/L Limit[6] lb/day | 45 mg/L Limit[6] lb/day | 50 mg/L Report lb/day | 2/Week | Composite |
| TSS Removal | ≥ 85 % | --- | --- | 1/Month | Calculation |
| pH Range[8] | 6.5-8.0 S.U. | | | 1/Day | Grab |
| *Escherichia coli* [9] Freshwater | 126/100 mL | --- | 406/100 mL | 3/Week | Grab |
| *Enterococci*[9] Tidal waters used for swimming | 35/100 mL | --- | 104/100 mL | 1/Day | Grab |

| Effluent Characteristic | Discharge Limitation[15] | | | Monitoring Requirement[1,2,3] | |
|---|---|---|---|---|---|
| Parameter | Average Monthly | Average Weekly | Maximum Daily | Measurement Frequency | Sample Type[4] |
| Fecal Coliform[9,10] Tidal waters used for shellfishing | 14/100 mL | --- | --- | 1/Day | Grab |
| Fecal Coliform[9,10] Tidal waters used for shellfishing (% of samples > 28/100 mL) | --- | --- | ≤ 10% | 1/Day | Grab |
| Total Residual Chlorine[11] | Limit mg/L | --- | Limit mg/L | 1/Day[11] | Grab |
| Total Metals[12] | Limit mg/L | --- | Limit mg/L | 2/Month | Composite |
| Total Phosphorus[12,22] (freshwater only; April 1 through October 31) | Limit lb/day | --- | --- | 2/Month | Composite |
| Ammonia Nitrogen[12] (specify season) | Limit mg/L | --- | Limit mg/L | 2/Week | Composite |
| Total Kjeldahl Nitrogen[13] (April 1 to October 31) (November 1 to March 31) | Report mg/L Report mg/L | --- --- | --- --- | 1/Week[13] 1/Month[13] | Composite Composite |
| Nitrate + Nitrite[13] (April 1 to October 31) (November 1 to March 31) | Report mg/L Report mg/L | --- --- | --- --- | 1/Week[13] 1/Month[13] | Composite Composite |
| Total Nitrogen[13] | Report mg/L Report lb/day | --- | --- | 1/Month[13] | Calculation |
| Rolling Average Total Nitrogen[13] | Limit lb/day | --- | --- | 1/Month | Calculation |
| PFAS Analytes[14] | --- | --- | Report ng/L | 1/Quarter | Grab |
| Adsorbable Organic Fluorine[15] | --- | --- | Report µg/L | 1/Quarter | Grab |
| Other[16] | Limit | --- | Limit | Varies | Composite |
| Pollutant Scan[17] | --- | --- | Report mg/L | 1/Year | Composite |

| Effluent Characteristic | Discharge Limitation[15] | | | Monitoring Requirement[1,2,3] | |
|---|---|---|---|---|---|
| Parameter | Average Monthly | Average Weekly | Maximum Daily | Measurement Frequency | Sample Type[4] |
| Whole Effluent Toxicity (WET) Testing[18,19] | | | | | |
| Dilution Factor (DF) ≥ 1 and < 10 | | | | | |
| $\quad LC_{50}$ | --- | --- | ≥ 100% | 4/Year | Composite |
| $\quad$ C-NOEC | --- | --- | ≥ (1/DF) x 100% | 4/Year | Composite |
| Dilution Factor ≥ 10 and < 20 | | | | | |
| $\quad LC_{50}$ | --- | --- | ≥ 100% | 4/Year | Composite |
| $\quad$ C-NOEC | --- | --- | Report % | 4/Year | Composite |
| Dilution Factor ≥ 20 and < 100 | | | | | |
| $\quad LC_{50}$ | --- | --- | ≥ 100% | 4/Year | Composite |
| Dilution Factor ≥ 100 and < 1,000 | | | | | |
| $\quad LC_{50}$ | --- | --- | ≥ 50% | 2/Year | Composite |
| Hardness (as $CaCo_3$) (freshwater only) | --- | --- | Report mg/L | Same as WET Measurement Frequency and Sample Type | |
| Ammonia Nitrogen | --- | --- | Report mg/L | | |
| Total Aluminum (freshwater only) | --- | --- | Report mg/L | | |
| Total Cadmium | --- | --- | Report mg/L | | |
| Total Copper | --- | --- | Report mg/L | | |
| Total Lead | --- | --- | Report mg/L | | |
| Total Nickel | --- | --- | Report mg/L | | |
| Total Zinc | --- | --- | Report mg/L | | |
| Total Organic Carbon | --- | --- | Report mg/L | | |

| Ambient Characteristic[20] | Reporting Requirements | | | Monitoring Requirements[1,2,3] | |
|---|---|---|---|---|---|
| | Average Monthly | Average Weekly | Maximum Daily | Measurement Frequency | Sample Type[4] |
| Hardness (freshwater only) | --- | --- | Report mg/L | | Grab |
| Salinity (marine only) | --- | --- | Report ppt | | Grab |

| | | | | | |
|---|---|---|---|---|---|
| Ammonia Nitrogen | --- | --- | Report mg/L | Same as WET Monitoring Frequency | Grab |
| Total Aluminum (freshwater only) | --- | --- | Report mg/L | | Grab |
| Total Cadmium | --- | --- | Report mg/L | | Grab |
| Total Copper | --- | --- | Report mg/L | | Grab |
| Total Nickel | --- | --- | Report mg/L | | Grab |
| Total Lead | --- | --- | Report mg/L | | Grab |
| Total Zinc | --- | --- | Report mg/L | | Grab |
| Total Organic Carbon | --- | --- | Report mg/L | | Grab |
| Dissolved Organic Carbon[21] (freshwater only) | --- | --- | Report mg/L | | Grab |
| pH[22] | --- | --- | Report S.U. | | Grab |
| Temperature[22] | --- | --- | Report °C | | Grab |
| Total Phosphorus[23] (freshwater only; *April 1 to October 31*) | --- | --- | Report mg/L | 1/Month | Grab |
| Pollutant Scan[17] | --- | --- | Report mg/L | 1/Year | Grab |
| Aesthetics[24] (DMR Attachment) | --- | --- | Report | 1/Month | Observation |

| | Reporting Requirements | | | Monitoring Requirements[1,2,3] | |
|---|---|---|---|---|---|
| **Influent Characteristic** | **Average Monthly** | **Average Weekly** | **Maximum Daily** | **Measurement Frequency** | **Sample Type[4]** |
| BOD$_5$ *or CBOD$_5$* [7] | Report mg/L | --- | --- | 2/Month | Composite |
| TSS | Report mg/L | --- | --- | 2/Month | Composite |
| PFAS Analytes[14] | --- | --- | Report ng/L | 1/Quarter | Grab |
| Adsorbable Organic Fluorine[15] | --- | --- | Report μg/L | 1/Quarter | Grab |

| | Reporting Requirements | | | Monitoring Requirements[1,2,3] | |
|---|---|---|---|---|---|
| **Sludge Characteristic** | **Average Monthly** | **Average Weekly** | **Maximum Daily** | **Measurement Frequency** | **Sample Type[4]** |
| PFAS Analytes[14] | --- | --- | Report ng/g | 1/Quarter[14] | Grab[25] |

for TKN and nitrate + nitrite shall be once per quarter. The results of these analyses shall be used to calculate both the concentration and mass loadings of total nitrogen, as follows.

Total Nitrogen (mg/L) = Total Kjeldahl Nitrogen (mg/L) + Nitrate + Nitrite (mg/L)

Total Nitrogen (lb/day) = [(average monthly Total Nitrogen (mg/L) * total monthly effluent flow (Millions of Gallons (MG)) / # of days in the month] * 8.34

For facilities with a rolling annual total nitrogen limit, the limit is an annual average mass-based limit (lb/day), which shall be reported as a rolling 12-month average. The value will be calculated as the arithmetic mean of the monthly average total nitrogen for the reporting month and the monthly average total nitrogen for the previous 11 months. Report both the rolling annual average and the monthly average each month.

For facilities discharging to the Long Island Sound watershed (*i.e.*, Claremont, Newport, Littleton, Lancaster, Lebanon, Hanover and Charlestown), see optimization requirements in Part II.H.3 of this permit.

See Part II.H.4 below for compliance schedules applicable to the TN limit for Hanover.

For facilities covered by the Great Bay Total Nitrogen General Permit (permit number NHG58A000; *i.e.*, Durham, Somersworth and Dover), these monitoring requirements do not apply.

14. Report in nanograms per liter (ng/L) for effluent and influent samples; report nanograms per gram (ng/g) for sludge samples. Until there is an analytical method approved in 40 CFR Part 136 for PFAS, monitoring shall be conducted using Method 1633A. Report in NetDMR the results of all PFAS analytes required to be tested in Method 1633A, as shown in Attachment H. This reporting requirement for the listed PFAS parameters takes effect the first full calendar quarter following six months after the effective date of the authorization. For Newport, this requirement takes effect in the calendar quarter beginning July 1, 2027.

Monitoring and reporting for PFAS in the sludge of lagoon facilities (*i.e.*, Lincoln WWTP, Ashland WWTF, Derry WWTP, Lancaster WWTF and Charlestown WWTP) shall be done once per permit term, in the first full 3rd calendar quarter following 6 months after the effective date of the authorization. This sampling shall include at least one representative sample per individual lagoon cell. Permittee shall submit a sampling plan to the NHDES Residual Management Section for review and approval at least 30 days prior to sampling.

15. Report in micrograms per liter (μg/L) for effluent and influent samples. Until there is an analytical method approved in 40 CFR Part 136 for Adsorbable Organic Fluorine, monitoring shall be conducted using Method 1621. This reporting requirement takes effect the first full calendar quarter following six months after the effective date of the authorization.

# EXHIBIT 7

for TKN and nitrate + nitrite shall be once per quarter. The results of these analyses shall be used to calculate both the concentration and mass loadings of total nitrogen, as follows.

Total Nitrogen (mg/L) = Total Kjeldahl Nitrogen (mg/L) + Nitrate + Nitrite (mg/L)

Total Nitrogen (lb/day) = [(average monthly Total Nitrogen (mg/L) * total monthly effluent flow (Millions of Gallons (MG)) / # of days in the month] * 8.34

For facilities with a rolling annual total nitrogen limit, the limit is an annual average mass-based limit (lb/day), which shall be reported as a rolling 12-month average. The value will be calculated as the arithmetic mean of the monthly average total nitrogen for the reporting month and the monthly average total nitrogen for the previous 11 months. Report both the rolling annual average and the monthly average each month.

For facilities discharging to the Long Island Sound watershed (*i.e.*, Claremont, Newport, Littleton, Lancaster, Lebanon, Hanover and Charlestown), see optimization requirements in Part II.H.3 of this permit.

See Part II.H.4 below for compliance schedules applicable to the TN limit for Hanover.

For facilities covered by the Great Bay Total Nitrogen General Permit (permit number NHG58A000; *i.e.*, Durham, Somersworth and Dover), these monitoring requirements do not apply.

14. Report in nanograms per liter (ng/L) for effluent and influent samples; report nanograms per gram (ng/g) for sludge samples. Until there is an analytical method approved in 40 CFR Part 136 for PFAS, monitoring shall be conducted using Method 1633A. Report in NetDMR the results of all PFAS analytes required to be tested in Method 1633A, as shown in Attachment H. This reporting requirement for the listed PFAS parameters takes effect the first full calendar quarter following six months after the effective date of the authorization. For Newport, this requirement takes effect in the calendar quarter beginning July 1, 2027.

Monitoring and reporting for PFAS in the sludge of lagoon facilities (*i.e.*, Lincoln WWTP, Ashland WWTF, Derry WWTP, Lancaster WWTF and Charlestown WWTP) shall be done once per permit term, in the first full 3rd calendar quarter following 6 months after the effective date of the authorization. This sampling shall include at least one representative sample per individual lagoon cell. Permittee shall submit a sampling plan to the NHDES Residual Management Section for review and approval at least 30 days prior to sampling.

15. Report in micrograms per liter (µg/L) for effluent and influent samples. Until there is an analytical method approved in 40 CFR Part 136 for Adsorbable Organic Fluorine, monitoring shall be conducted using Method 1621. This reporting requirement takes effect the first full calendar quarter following six months after the effective date of the authorization.

information shall be updated at a minimum of once per year or at that frequency necessary to ensure that all SIUs are properly permitted and/or controlled. The records shall be maintained and updated as necessary.

4. Beginning the first full calendar year after the effective date of the authorization, the Permittee shall conduct or require annual sampling of the following types of industrial discharges into the POTW:

- Commercial Car Washes
- Platers/Metal Finishers
- Paper and Packaging Manufacturers
- Tanneries and Leather/Fabric/Carpet Treaters
- Manufacturers of Parts with Polytetrafluoroethylene (PTFE) or teflon type coatings (i.e. bearings)
- Landfill Leachate
- Centralized Waste Treaters
- Known or Suspected PFAS Contaminated Sites
- Fire Fighting Training Facilities
- Airports
- Any Other Known or Expected Sources of PFAS

Sampling shall be conducted using Method 1633A for the PFAS analytes listed in Attachment H. The industrial discharges sampled and the sampling results shall be summarized and submitted to EPA and the State as an electronic attachment to the March discharge monitoring report due **April 15** of the calendar year following the testing.

## F. INDUSTRIAL PRETREATMENT PROGRAMS

The following requirements only apply to dischargers that are required to conduct an Industrial Pretreatment Program (IPP). This section applies only to the following WWTFs: Dover, Somersworth, Jaffrey, Milford, Derry, Merrimack and Claremont.

1. Legal Authority

The Permittee has been delegated primary responsibility for enforcing against discharges prohibited by 40 CFR 403.5 and applying and enforcing any national Pretreatment Standards established by the United States Environmental Protection Agency in accordance with Section 307 (b) and (c) of The Clean Water Act (Act), as amended by The Water Quality Act (WQA), of 1987.

The Permittee shall operate an industrial pretreatment program in accordance with the General Pretreatment Regulations found in 40 CFR Part 403 and the approved pretreatment program submitted by the Permittee. The approved pretreatment program, and any



EXHIBIT 8

for TKN and nitrate + nitrite shall be once per quarter. The results of these analyses shall be used to calculate both the concentration and mass loadings of total nitrogen, as follows.

Total Nitrogen (mg/L) = Total Kjeldahl Nitrogen (mg/L) + Nitrate + Nitrite (mg/L)

Total Nitrogen (lb/day) = [(average monthly Total Nitrogen (mg/L) * total monthly effluent flow (Millions of Gallons (MG)) / # of days in the month] * 8.34

For facilities with a rolling annual total nitrogen limit, the limit is an annual average mass-based limit (lb/day), which shall be reported as a rolling 12-month average. The value will be calculated as the arithmetic mean of the monthly average total nitrogen for the reporting month and the monthly average total nitrogen for the previous 11 months. Report both the rolling annual average and the monthly average each month.

For facilities discharging to the Long Island Sound watershed (*i.e.*, Claremont, Newport, Littleton, Lancaster, Lebanon, Hanover and Charlestown), see optimization requirements in Part II.H.3 of this permit.

See Part II.H.4 below for compliance schedules applicable to the TN limit for Hanover.

For facilities covered by the Great Bay Total Nitrogen General Permit (permit number NHG58A000; *i.e.*, Durham, Somersworth and Dover), these monitoring requirements do not apply.

14. Report in nanograms per liter (ng/L) for effluent and influent samples; report nanograms per gram (ng/g) for sludge samples. Until there is an analytical method approved in 40 CFR Part 136 for PFAS, monitoring shall be conducted using Method 1633A. Report in NetDMR the results of all PFAS analytes required to be tested in Method 1633A, as shown in Attachment H. This reporting requirement for the listed PFAS parameters takes effect the first full calendar quarter following six months after the effective date of the authorization. For Newport, this requirement takes effect in the calendar quarter beginning July 1, 2027.

    Monitoring and reporting for PFAS in the sludge of lagoon facilities (*i.e.*, Lincoln WWTP, Ashland WWTF, Derry WWTP, Lancaster WWTF and Charlestown WWTP) shall be done once per permit term, in the first full 3rd calendar quarter following 6 months after the effective date of the authorization. This sampling shall include at least one representative sample per individual lagoon cell. Permittee shall submit a sampling plan to the NHDES Residual Management Section for review and approval at least 30 days prior to sampling.

15. Report in micrograms per liter (μg/L) for effluent and influent samples. Until there is an analytical method approved in 40 CFR Part 136 for Adsorbable Organic Fluorine, monitoring shall be conducted using Method 1621. This reporting requirement takes effect the first full calendar quarter following six months after the effective date of the authorization.



EXHIBIT 9

"SEC. 308. (a) Whenever required to carry out the objective of this Act, including but not limited to (1) developing or assisting in the development of any effluent limitation, or other limitation, prohibition, or effluent standard, pretreatment standard, or standard of performance under this Act; (2) determining whether any person is in violation of any such effluent limitation, or other limitation, prohibition or effluent standard, pretreatment standard, or standard of performance; (3) any requirement established under this section; or (4) carrying out sections 305, 311, 402, 404 (relating to State permit programs), 405, and 504 of this Act—

(A) the Administrator shall require the owner or operator of any point source to (i) establish and maintain such records, (ii) make such reports, (iii) install, use, and maintain such monitoring equipment or methods (including where appropriate, biological monitoring methods), (iv) sample such effluents (in accordance with such methods, at such locations, at such intervals, and in such manner as the Administrator shall prescribe), and (v) provide such other information as he may reasonably require;".

(See 40 CFR § 122.21(e)(3)(ii) and 40 CFR § 122.44(i)(1)(iv)(B)).

In the absence of a final 40 CFR § 136 method for measuring PFAS in wastewater and sludge, the Draft General Permit requires the use of Method 1633. Monitoring should include each of the 40 PFAS parameters detectable by Method 1633 (see Draft General Permit Attachment H for list of PFAS parameters) and the monitoring frequency is quarterly. Reporting of all 40 PFAS analytes is necessary to address the emerging understanding and remaining uncertainties regarding sources and types of analytes of PFAS in wastewater and their impacts. While NHDES has currently adopted MCLs for only 4 of these analytes as described above, it is possible that MCLs, water quality criteria and/or effluent limitation guidelines could be adopted for many of the other 36 analytes measured by Method 1633 during the life of the permit. Therefore, EPA considers it prudent to require reporting for all 40 analytes that are measured using Method 1633 to ensure EPA has sufficient data to address each of these PFAS analytes in the future. This level of monitoring is recommended in EPA's *October 2021 PFAS Strategic Roadmap*[13] and in an EPA memo dated April 28, 2022, called *Addressing PFAS Discharges in EPA-Issued NPDES Permits and Expectations Where EPA is the Pretreatment Control Authority*[14].

All PFAS results must be reported on DMRs (see 40 CFR § 122.41)(l)(4)(i)). This approach is consistent with 40 CFR § 122.44(i)(1)(iv)(B) which states that in the case of pollutants or pollutant parameters for which there are no approved methods under 40 CFR Part 136 or methods are not otherwise required under 40 CFR chapter I, subchapter N or O, monitoring shall be conducted according to a test procedure specified in the permit for such pollutants or pollutant parameters.

---

[13] https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf
[14] https://www.epa.gov/system/files/documents/2022-04/npdes_pfas-memo.pdf

# EXHIBIT 10

quantify all of the <u>organofluorine it captures with the same accuracy and has some</u> <u>known interferences</u> that are discussed in the first section of the method (see Method 1621 link above). The <u>method tells the</u> <u>user that organofluorines are present but</u> <u>cannot identify which specific organofluorines are present.</u> The strength of the method is that it can broadly screen for thousands of known PFAS compounds at the **part per billion level** in aqueous (water) samples.

The Office of Water led a multi-laboratory validation study of Method 1621. The Office of Water used the results of the multi-laboratory validation study to finalize the method and develop formal performance criteria. The <u>Office of Water encourages interested</u> <u>parties to review and use the</u> <u>method, with the understanding that it may undergo</u> <u>revision during a rulemaking</u> <u>process.</u> <u>Method 1621 is not nationally required for CWA</u> <u>compliance monitoring until the EPA has</u> <u>promulgated it through rulemaking</u>**.** <u>CWA</u> <u>Analytical Methods for Per- and Polyfluorinated Alkyl</u> Substances (PFAS) | US EPA[5]

Note the method measures in the microgram per liter range (ug/l) and the request by the EPA in footnote 15 is for measurement in nanograms per liter (ng/l). This test is not compatible with the EPA's request to measure down to the parts per trillion.

[1] <u>View Rule</u>

[2] <u>*Proposed Rule: Clean Water Act Methods Update Rule 22 for the Analysis of Pollutants in Effluent</u>

[3] CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA

[4] <u>Method 1621 Determination of Adsorbable Organic Fluorine (AOF) in Aqueous Matrices by Combustion</u> <u>Ion</u> <u>Chromatography (CIC)</u>

[5] <u>CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA</u>

> **Response 11**
>
> CWA §§ 301, 304(h), 307, and 501(a) authorize EPA to promulgate guidelines establishing test procedures for the analysis of pollutants. EPA has promulgated such guidelines at 40 C.F.R. Part 136. EPA has also promulgated a regulation specifying that: "In the case of pollutants or pollutant parameters for which there are no approved methods under 40 CFR part 136…, monitoring shall be conducted according to a test procedure specified in the permit….". 40 C.F.R. § 122.44(i)(v)(B). *See also* 40 C.F.R. § 122.21(e)(3)(ii) (in an application for discharge, "[if] no analytical method… has been approved under 40 CFR part 136… the applicant may use any suitable method…."). Consistent with these regulations, the permit requires the use of Methods 1621 and 1633 because there are not any relevant methods in Part 136. EPA also notes that Methods 1633 and 1621 are both final methods and already went through a rigorous multi-lab validation process of development, including multiple rounds of review and comment, and have well documented accuracy and precision.
>
> Regarding footnotes 2, 14 and 15, EPA recognizes that 40 CFR Part 136 does not include any methods for PFAS or AOF so footnote 2 does not apply until these methods are promulgated in Part 136. Therefore, EPA has specified in footnotes 14 and 15 that the

# EXHIBIT 11

for TKN and nitrate + nitrite shall be once per quarter. The results of these analyses shall be used to calculate both the concentration and mass loadings of total nitrogen, as follows.

Total Nitrogen (mg/L) = Total Kjeldahl Nitrogen (mg/L) + Nitrate + Nitrite (mg/L)

Total Nitrogen (lb/day) = [(average monthly Total Nitrogen (mg/L) * total monthly effluent flow (Millions of Gallons (MG)) / # of days in the month] * 8.34

For facilities with a rolling annual total nitrogen limit, the limit is an annual average mass-based limit (lb/day), which shall be reported as a rolling 12-month average. The value will be calculated as the arithmetic mean of the monthly average total nitrogen for the reporting month and the monthly average total nitrogen for the previous 11 months. Report both the rolling annual average and the monthly average each month.

For facilities discharging to the Long Island Sound watershed (*i.e.*, Claremont, Newport, Littleton, Lancaster, Lebanon, Hanover and Charlestown), see optimization requirements in Part II.H.3 of this permit.

See Part II.H.4 below for compliance schedules applicable to the TN limit for Hanover.

For facilities covered by the Great Bay Total Nitrogen General Permit (permit number NHG58A000; *i.e.*, Durham, Somersworth and Dover), these monitoring requirements do not apply.

14. Report in nanograms per liter (ng/L) for effluent and influent samples; report nanograms per gram (ng/g) for sludge samples. Until there is an analytical method approved in 40 CFR Part 136 for PFAS, monitoring shall be conducted using Method 1633A. Report in NetDMR the results of all PFAS analytes required to be tested in Method 1633A, as shown in Attachment H. This reporting requirement for the listed PFAS parameters takes effect the first full calendar quarter following six months after the effective date of the authorization. For Newport, this requirement takes effect in the calendar quarter beginning July 1, 2027.

    Monitoring and reporting for PFAS in the sludge of lagoon facilities (*i.e.*, Lincoln WWTP, Ashland WWTF, Derry WWTP, Lancaster WWTF and Charlestown WWTP) shall be done once per permit term, in the first full 3rd calendar quarter following 6 months after the effective date of the authorization. This sampling shall include at least one representative sample per individual lagoon cell. Permittee shall submit a sampling plan to the NHDES Residual Management Section for review and approval at least 30 days prior to sampling.

15. Report in micrograms per liter (µg/L) for effluent and influent samples. Until there is an analytical method approved in 40 CFR Part 136 for Adsorbable Organic Fluorine, monitoring shall be conducted using Method 1621. This reporting requirement takes effect the first full calendar quarter following six months after the effective date of the authorization.

quantify all of the <u>organofluorine it captures with the same accuracy and has some known interferences</u> that are discussed in the first section of the method (see Method 1621 link above). The <u>method tells the</u> <u>user that organofluorines are present but cannot identify which specific organofluorines are present.</u> The strength of the method is that it can broadly screen for thousands of known PFAS compounds at the **part per billion level** in aqueous (water) samples.

The Office of Water led a multi-laboratory validation study of Method 1621. The Office of Water used the results of the multi-laboratory validation study to finalize the method and develop formal performance criteria. The <u>Office of Water encourages interested parties to review and use the</u> <u>method, with the understanding that it may undergo revision during a rulemaking</u> process. <u>Method 1621 is not nationally required for CWA compliance monitoring until the EPA has</u> <u>promulgated it through rulemaking</u>. <u>CWA Analytical Methods for Per- and Polyfluorinated Alkyl</u> Substances (PFAS) | US EPA[5]

Note the method measures in the microgram per liter range (ug/l) and the request by the EPA in footnote 15 is for measurement in nanograms per liter (ng/l). This test is not compatible with the EPA's request to measure down to the parts per trillion.

[1] [View Rule](#)

[2] [*Proposed Rule: Clean Water Act Methods Update Rule 22 for the Analysis of Pollutants in Effluent](#)

[3] CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA

[4] [Method 1621 Determination of Adsorbable Organic Fluorine (AOF) in Aqueous Matrices by Combustion Ion Chromatography (CIC)](#)

[5] [CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA](#)

### Response 11

CWA §§ 301, 304(h), 307, and 501(a) authorize EPA to promulgate guidelines establishing test procedures for the analysis of pollutants. EPA has promulgated such guidelines at 40 C.F.R. Part 136. EPA has also promulgated a regulation specifying that: "In the case of pollutants or pollutant parameters for which there are no approved methods under 40 CFR part 136…, monitoring shall be conducted according to a test procedure specified in the permit….". 40 C.F.R. § 122.44(i)(v)(B). *See also* 40 C.F.R. § 122.21(e)(3)(ii) (in an application for discharge, "[if] no analytical method… has been approved under 40 CFR part 136… the applicant may use any suitable method…."). Consistent with these regulations, the permit requires the use of Methods 1621 and 1633 because there are not any relevant methods in Part 136. EPA also notes that Methods 1633 and 1621 are both final methods and already went through a rigorous multi-lab validation process of development, including multiple rounds of review and comment, and have well documented accuracy and precision.

Regarding footnotes 2, 14 and 15, EPA recognizes that 40 CFR Part 136 does not include any methods for PFAS or AOF so footnote 2 does not apply until these methods are promulgated in Part 136. Therefore, EPA has specified in footnotes 14 and 15 that the

Permittee must use Methods 1633 and 1621, respectively. Based on this comment, EPA agrees that the most recent revision of Method 1633 is referred to as Method 1633A (which addresses minor editorial issues and clarifies several technical concerns). Therefore, EPA has updated the Final General Permit to require Method 1633A until a method is approved in Part 136.

Regarding Method 1621, EPA recognizes that this method is a screening method for wastewater. As noted on page 44 of the Fact Sheet, "Given the future regulatory uncertainty and that this AOF monitoring will screen for a broader range of organofluorines, such as PFAS and other emerging contaminants, EPA considers it appropriate to monitoring for AOF as well as PFAS to ensure the discharge is fully characterized with respect to these pollutants in the next permit reissuance." Therefore, this monitoring requirement will remain in the Final General Permit. However, EPA agrees that Method 1621 specifies units of µg/L, so EPA has updated the Final General Permit to include these units rather than ng/L.

**Comment 12**

The current EPA's position nationally was only to have wastewater treatment plants 10 MGD or larger to begin testing for PFAS and Adsorbable Organic Fluorine. EPA has a heavily populated website on the 'POTW Influent PFAS Study' ([POTW Influent PFAS Study | US EPA](#)). There was an initial Register notice posted on March 26, 2024, with comments to be received by May 28, 2024 ([Federal Register :: Proposed Information Collection Request; Comment Request; POTW Influent](#) [PFAS Study Data Collection](#)). In this notice, questionnaires were to be sent to 400 of the largest WWTPs out of the 12,000 (2.7% of the total WWTPs) in the US. Mandatory responses were required and subsets of 200 – 300 plants would be asked to conduct specific sampling in two phases. The Phase One expectation cited, "*Phase 1 will require each selected POTW to collect and analyze one-time grab samples of industrial user effluent, domestic wastewater influent, POTW influent, and POTW effluent for forty specific PFAS and adsorbable organic fluorine (AOF). For each POTW selected, the EPA intends to specify no more than ten industrial users for which the POTW must collect and analyze effluent samples. The total number of industrial users sampled as part of the sampling program is not expected to exceed 2,000 facilities. Phase 2 will require selected POTWs to collect and analyze one-time grab samples of sewage sludge for forty specific PFAS and ancillary parameters.*" At 200 subset plants with 2,000 industrial facilities equates to 2,200 tests. If it is 300 facilities it is 2,300 tests. In the Phase I Study the EPA calls for a one-time grab of the industrial user's effluent (2,000 tests) and a one-time grab of the plant's influent and effluent (400 to 600) tests. At most there will be 2,600 tests run in phase I. EPA estimates that Phase I will get underway in 2025. The Office of Management and Budget did a cost analysis for the above study.[6] The treatment plants would need to dedicate 25,640 hours for 5.5 million dollars. That is only administrative costs and sampling field work. That amounts to $2,115.38 for each of the 2,600 tests run in phase 1. The current cost for one PFAS sample is approximately $500.00. The cost for AOF is approximately $440.00. The total cost per test is $3,055.38. At 22 required tests annually (12 for the plant, inf, eff, sludge, and anticipate 10 industries) for each MGP the cost to each MGP WWTP would be $67,218.36 per year.



EXHIBIT 12

quantity all of the <u>organofluorine it captures with the same accuracy and has some</u> <u>known interferences</u> that are discussed in the first section of the method (see Method 1621 link above). The <u>method tells the</u> <u>user that organofluorines are present but</u> <u>cannot identify which specific organofluorines are</u> present. The strength of the method is that it can broadly screen for thousands of known PFAS compounds at the **part per billion level** in aqueous (water) samples.

The Office of Water led a multi-laboratory validation study of Method 1621. The Office of Water used the results of the multi-laboratory validation study to finalize the method and develop formal performance criteria. The <u>Office of Water encourages interested</u> <u>parties to review and use the</u> <u>method, with the understanding that it may undergo</u> <u>revision during a rulemaking</u> process. Method 1621 is not nationally required for CWA <u>compliance monitoring until the EPA has</u> <u>promulgated it through rulemaking</u>. <u>CWA</u> <u>Analytical Methods for Per- and Polyfluorinated Alkyl</u> Substances (PFAS) | US EPA[5]

Note the method measures in the microgram per liter range (ug/l) and the request by the EPA in footnote 15 is for measurement in nanograms per liter (ng/l). This test is not compatible with the EPA's request to measure down to the parts per trillion.

[1] <u>View Rule</u>

[2] <u>*Proposed Rule: Clean Water Act Methods Update Rule 22 for the Analysis of Pollutants in Effluent</u>

[3] CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA

[4] <u>Method 1621 Determination of Adsorbable Organic Fluorine (AOF) in Aqueous Matrices by Combustion</u> <u>Ion</u> <u>Chromatography (CIC)</u>

[5] <u>CWA Analytical Methods for Per- and Polyfluorinated Alkyl Substances (PFAS) | US EPA</u>

### Response 11

CWA §§ 301, 304(h), 307, and 501(a) authorize EPA to promulgate guidelines establishing test procedures for the analysis of pollutants. EPA has promulgated such guidelines at 40 C.F.R. Part 136. EPA has also promulgated a regulation specifying that: "In the case of pollutants or pollutant parameters for which there are no approved methods under 40 CFR part 136…, monitoring shall be conducted according to a test procedure specified in the permit….". 40 C.F.R. § 122.44(i)(v)(B). *See also* 40 C.F.R. § 122.21(e)(3)(ii) (in an application for discharge, "[if] no analytical method… has been approved under 40 CFR part 136… the applicant may use any suitable method…."). Consistent with these regulations, the permit requires the use of Methods 1621 and 1633 because there are not any relevant methods in Part 136. EPA also notes that Methods 1633 and 1621 are both final methods and already went through a rigorous multi-lab validation process of development, including multiple rounds of review and comment, and have well documented accuracy and precision.

Regarding footnotes 2, 14 and 15, EPA recognizes that 40 CFR Part 136 does not include any methods for PFAS or AOF so footnote 2 does not apply until these methods are promulgated in Part 136. Therefore, EPA has specified in footnotes 14 and 15 that the

Permittee must use Methods 1633 and 1621, respectively. Based on this comment, EPA agrees that the most recent revision of Method 1633 is referred to as Method 1633A (which addresses minor editorial issues and clarifies several technical concerns). Therefore, EPA has updated the Final General Permit to require Method 1633A until a method is approved in Part 136.

Regarding Method 1621, EPA recognizes that this method is a screening method for wastewater. As noted on page 44 of the Fact Sheet, "Given the future regulatory uncertainty and that this AOF monitoring will screen for a broader range of organofluorines, such as PFAS and other emerging contaminants, EPA considers it appropriate to monitoring for AOF as well as PFAS to ensure the discharge is fully characterized with respect to these pollutants in the next permit reissuance." Therefore, this monitoring requirement will remain in the Final General Permit. However, EPA agrees that Method 1621 specifies units of µg/L, so EPA has updated the Final General Permit to include these units rather than ng/L.

**Comment 12**

The current EPA's position nationally was only to have wastewater treatment plants 10 MGD or larger to begin testing for PFAS and Adsorbable Organic Fluorine. EPA has a heavily populated website on the 'POTW Influent PFAS Study' ([POTW Influent PFAS Study | US EPA](#)). There was an initial Register notice posted on March 26, 2024, with comments to be received by May 28, 2024 ([Federal Register :: Proposed Information Collection Request; Comment Request; POTW Influent](#) [PFAS Study Data Collection](#)). In this notice, questionnaires were to be sent to 400 of the largest WWTPs out of the 12,000 (2.7% of the total WWTPs) in the US. Mandatory responses were required and subsets of 200 – 300 plants would be asked to conduct specific sampling in two phases. The Phase One expectation cited, "*Phase 1 will require each selected POTW to collect and analyze one-time grab samples of industrial user effluent, domestic wastewater influent, POTW influent, and POTW effluent for forty specific PFAS and adsorbable organic fluorine (AOF). For each POTW selected, the EPA intends to specify no more than ten industrial users for which the POTW must collect and analyze effluent samples. The total number of industrial users sampled as part of the sampling program is not expected to exceed 2,000 facilities. Phase 2 will require selected POTWs to collect and analyze one-time grab samples of sewage sludge for forty specific PFAS and ancillary parameters.*" At 200 subset plants with 2,000 industrial facilities equates to 2,200 tests. If it is 300 facilities it is 2,300 tests. In the Phase I Study the EPA calls for a one-time grab of the industrial user's effluent (2,000 tests) and a one-time grab of the plant's influent and effluent (400 to 600) tests. At most there will be 2,600 tests run in phase I. EPA estimates that Phase I will get underway in 2025. The Office of Management and Budget did a cost analysis for the above study.[6] The treatment plants would need to dedicate 25,640 hours for 5.5 million dollars. That is only administrative costs and sampling field work. That amounts to $2,115.38 for each of the 2,600 tests run in phase 1. The current cost for one PFAS sample is approximately $500.00. The cost for AOF is approximately $440.00. The total cost per test is $3,055.38. At 22 required tests annually (12 for the plant, inf, eff, sludge, and anticipate 10 industries) for each MGP the cost to each MGP WWTP would be $67,218.36 per year.

# EXHIBIT 13

| TESTING IN NEW PERMIT | Column1 | Column2 | Column3 | Column4 | Column5 | Column6 | Column7 | Column8 |
|---|---|---|---|---|---|---|---|---|
| TEST | FREQUENCY | Total tests per year with new permit | Total Tests in current permit | Total additional tests required | Cost per test | dd'l Labor Req | Cost/hr | Total Cost |
| Ammonia Nitrogen | 2 x week | 106 | 2 | 104 | $ 18.20 | 52 | $ 50.00 | $ 4,492.80 |
| TKN | 1 x week(4/1-10/31) | 30 | 0 | 30 | $ 32.90 | 30 | $ 50.00 | $ 2,487.00 |
| TKN | 1 x month (11/1-3/31) | 5 | 0 | 5 | $ 32.90 | 5 | $ 50.00 | $ 414.50 |
| Nitrate | 1 x week(4/1-10/31) | 30 | 0 | 30 | $ 14.70 | 30 | $ 50.00 | $ 1,941.00 |
| Nitrate | 1 x month (11/1-3/31) | 5 | 0 | 5 | $ 14.70 | 5 | $ 50.00 | $ 323.50 |
| Nitrite | 1 x week(4/1-10/31) | 30 | 0 | 30 | $ 14.70 | 30 | $ 50.00 | $ 1,941.00 |
| Nitrite | 1 x month (11/1-3/31) | 5 | 0 | 5 | $ 14.70 | 5 | $ 50.00 | $ 323.50 |
| Total nitrogen | 1 x week | 52 | 0 | 52 | $ 14.70 | 52 | $ 50.00 | $ 3,364.40 |
| Rolling Nitrogen Avg | monthly | 52 | 0 | 52 | $ 1.00 | 15 | $ 175.00 | $ 2,677.00 |
| | | | | 0 | | | | |
| ~~Total Metals~~ | ~~2x month~~ | ~~24~~ | ~~2~~ | | ~~$ 145.60~~ | | ~~$ 50.00~~ | ~~$ -~~ |
| ~~Aluminum~~ | ~~2x month~~ | ~~24~~ | ~~4~~ | ~~20~~ | | ~~20~~ | | |
| | | | | 0 | | | | |
| PFAS -Influent | Quarterly + blanks | 8 | 0 | 8 | $ 420.00 | 8 | $ 50.00 | $ 3,760.00 |
| PFAS - Effluent | Quarterly + blanks | 8 | 0 | 8 | $ 420.00 | 8 | $ 50.00 | $ 3,760.00 |
| PFAS - Sludge | Quarterly + blanks | 8 | 0 | 8 | $ 420.00 | 8 | $ 50.00 | $ 3,760.00 |
| Adsorbable Organic Fluorine-inf | Quarterly + blanks | 8 | 0 | 8 | $ 1,100.00 | 12 | $ 50.00 | $ 9,400.00 |
| Adsorbable Organic Fluorine-eff | Quarterly + blanks | 8 | 0 | 8 | $ 1,100.00 | 12 | $ 50.00 | $ 9,400.00 |
| | | | | | | | | |
| Phosphorus | Influent (4/1-10/31) 2x month | 14 | 0 | 14 | $ 29.40 | 14 | $ 50.00 | $ 1,111.60 |
| | Effluent (4/1-10/31)2x month | 14 | 12 | 2 | $ 29.40 | 2 | $ 50.00 | $ 158.80 |
| | River(Ambient) (4/1-10/31)1x month | 7 | 0 | 7 | $ 29.40 | 7 | $ 50.00 | $ 555.80 |
| Organic Carbon | River(Ambient) 2x year | 2 | 0 | 2 | $ 68.50 | 2 | $ 50.00 | $ 237.00 |
| Dissolved organic Carbon | River(Ambient) 2x year | 2 | 0 | 2 | $ 68.50 | 2 | $ 50.00 | $ 237.00 |
| | | | | 0 | | | | |
| Industries | General Electric | 2 | 0 | 2 | $ 1,520.00 | 4 | $ 50.00 | $ 3,240.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Cummings | 2 | 0 | 2 | $ | 1,520.00 | 4 | $ 50.00 | $ 3,240.00 |
| Car Washes | Black Diamond | 2 | 0 | 2 | $ | 1,520.00 | 4 | $ 50.00 | $ 3,240.00 |
| | Circle K south | 2 | 0 | 2 | $ | 1,520.00 | 4 | $ 50.00 | $ 3,240.00 |
| | Behind Kmart | 2 | 0 | 2 | $ | 1,520.00 | 4 | $ 50.00 | $ 3,240.00 |
| | Across from Faulkner | 2 | 0 | 2 | $ | 1,520.00 | 4 | $ 50.00 | $ 3,240.00 |
| | Merchants | 2 | 0 | 2 | $ | 1,520.00 | 4 | $ 50.00 | $ 3,240.00 |
| | Washville | 2 | 0 | 2 | $ | 1,520.00 | 4 | $ 50.00 | $ 3,240.00 |
| | Golden Nozzle | 2 | 0 | 2 | $ | 1,520.00 | 4 | $ 50.00 | $ 3,240.00 |
| | | | | | | | | | |
| Pollutant Scan | | 1 | 0 | 1 | $ | 1,840.00 | 2 | $ 50.00 | $ 1,940.00 |
| | | | | 0 | | | | $ - | |
| | TESTING TOTALS | 456 | | 456 | | | 347 | | $ 81,444.90 |

**REPORTS IN NEW PERMIT**

| REPORT | FREQUENCY | Total reports per year | Cost/hr | | Add'l Labor Req'd | Total Cost |
|---|---|---|---|---|---|---|
| Flow - rolling average | daily-program | 1 | $ | 125.00 | 8 | $ 1,000.00 |
| | monthly-program | 12 | $ | 125.00 | 1 | $ 1,500.00 |
| | | | | | | |
| Chlorine Excursions | as needed | 10 | $ | 125.00 | 5 | $ 6,250.00 |
| | | | | | | |
| Aluminum Compliance | 1 x year | 0 | $ | 125.00 | 0 | $ - |
| | | | | | | |
| Ambient Phosphorus Plan | 1 x year | 1 | $ | 125.00 | 2 | $ 250.00 |
| | | | | | | |
| Total Nitrogen | daily-program | 1 | $ | 125.00 | 2.5 | $ 312.50 |
| | weekly-program | 52 | $ | 125.00 | 0.25 | $ 1,625.00 |
| | monthly-program | 12 | $ | 125.00 | 3.5 | $ 5,250.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total Nitrogen-Rolling | program | 1 | | $ | 125.00 | 3.5 | $ 437.50 |
| | | | | | | | |
| Overflow Emergency Response | 1x year | 1 | | $ | 125.00 | 4 | $ 500.00 |
| | | | | | | | |
| Outfall reports | monthly+ year end | 13 | | | | | |
| | | | | | | | |
| Industrial Pretreatment | | | | | | | |
| a. new discharges | as needed | 1 | | $ | 125.00 | 1 | $ 125.00 |
| b. change in discharges | as needed | 1 | | $ | 125.00 | 1 | $ 125.00 |
| c. reports from industries(2) | 4 x year x1 industries | 4 | | $ | 125.00 | 1 | $ 500.00 |
| d. annual report | 1 x year | 1 | | $ | 125.00 | 3 | $ 375.00 |
| e. our sampling of ind.+blank | 1 x year x 1 industries | 2 | | $ | 125.00 | 3 | $ 750.00 |
| f. carwashes (5)+blank | 1 x year x 7 carwashes | 14 | | $ | 125.00 | 2 | $ 3,500.00 |
| | | | | | | | |
| | | | | | | | |
| ~~Adaptation Planning~~ | | | | | | | |
| ~~a. Initial report~~ | ~~1~~ | ~~1~~ | | ~~$ 125.00~~ | | ~~0~~ | ~~$ -~~ |
| ~~b. Schedule of Implementation~~ | ~~1~~ | ~~1~~ | | ~~$ 125.00~~ | | ~~0~~ | ~~$ -~~ |
| ~~c. Progress Reports~~ | ~~1 x year~~ | ~~1~~ | | ~~$ 125.00~~ | | ~~0~~ | ~~$ -~~ |
| | | | | | | | |
| ~~Facility Specific Report~~ | ~~1 x year~~ | ~~1~~ | | ~~$ 125.00~~ | | ~~0~~ | ~~$ -~~ |
| | | | | | | | |
| | Report total | 131 | | | | 0.00 | $ 22,500.00 |
| | | | | | | | |
| | | | | Reports & Testing Total | | | $ 103,944.90 |